**Darrell LAKE, Rian Maguire, RCC Medical #1 GenPar, LLC, and Realty Capital Corp. and Richard Myers and Realty Capital Partners, LLC, Appellants**

**v.**

**George F. CRAVENS, M.D., RCC Medical District Facilities, Ltd., and Center for Neurological Disorders Hospital, LP, Appellees**

NO. 02–11–00464–CV

Court of Appeals of Texas, Fort Worth.

DELIVERED: April 28, 2016

---

DONALD E. HERRMANN, BRANDON HURLEY, MEGAN M. COOLEY, KELLY HART & HALLMAN LLP, FORT WORTH, TX, FOR APPELLANTS DARRELL LAKE, RIAN MAGUIRE, RCC MEDICAL #1 GENPAR, LLC, AND REALTY CAPITAL CORP.

WADE C. CROSNOE, SARA M. BERKELEY, THOMPSON, COE, COUSINS & IRONS, L.L.P., AUSTIN, TX, AND WILLIAM N. RADFORD, BRADFORD K. BURDETTE, THOMPSON, COE, COUSINS & IRONS, L.L.P., DALLAS, TX, FOR APPELLANTS RICHARD MYERS AND REALTY CAPITAL PARTNERS, LLC.

PAUL F. WIENESKIE, BAILEY & GALYEN, ARLINGTON, TX, AND CARTER L. HAMPTON, THE HAMPTON LAW FIRM, P.C., FORT WORTH, TX, FOR APPELLEES.

PANEL: DAUPHINOT, MEIER, and GABRIEL, JJ.

## OPINION ON REHEARING

BILL MEIER, JUSTICE

Appellees George F. Cravens, M.D.; RCC Medical District Facilities, Ltd. (the

Partnership); and Center for Neurological Disorders Hospital, LP. (CNDH) filed a motion for rehearing of our opinion that issued on October 29, 2015. We deny the motion, withdraw our opinion and judgment dated October 29, 2015, and substitute the following.

## I. INTRODUCTION

Dr. Cravens dreamed of constructing and owning a neurosurgical hospital in Fort Worth. Between mid–2007 and November 2009—while the country was experiencing the worst economic downturn since the Great Depression—numerous individuals and entities worked towards making that dream a reality. Ultimately, however, the project never obtained a construction loan commitment, the hospital was never built, and Dr. Cravens sued all of the appellants under a number of theories for various acts or omissions that allegedly occurred both before and during the development process. A jury later made a number of affirmative findings on liability and damages, and after Dr. Cravens and the Partnership elected their remedies, the trial court signed a final judgment on the jury's verdict. This appeal followed.

There are two groups of appellants. In nine issues, Appellants Darrell Lake, Rian Maguire, RCC Medical # 1 GenPar, LLC (GenPar), and Realty Capital Corp. (RCC) (collectively, the RCC Appellants) challenge (i) Dr. Cravens's standing to recover in his individual capacity, (ii) the jury's fraud, promissory estoppel, and unjust enrichment findings, (iii) the admissibility of expert testimony, (iv) the jury's attorneys' fees and damages awards, and (v) the trial court's denial of contractual indemnification for Rian. In six issues, Appellants

Richard Myers and Realty Capital Partners, LLC (RCP) (collectively, the RCP Appellants) argue that Dr. Cravens lacks standing to recover in his individual capacity, that the evidence is legally and factually insufficient to support the jury's liability and damages findings, that Dr. Cravens ratified the parties' partnership agreement, and that Dr. Cravens should not recover attorneys' fees. We will reverse and remand.

## II. BACKGROUND

### A. Individuals and Entities

Dr. Cravens practices neurological surgery in Fort Worth. He heads the Department of Neurosurgery at John Peter Smith Hospital and has privileges at "[e]ssentially all of the downtown hospitals" in Fort Worth.

Dr. Cravens does business through, and is the president of, Center for Neurological Disorders, PA (CND, PA), a professional association founded in 1992. CND, PA consists of five neurosurgeons, two anesthesiologists, and one neurologist.

Kim Reed began working as the administrator for Dr. Cravens and CND, PA in 2001. Dr. Cravens does not have an email address, so to correspond with him, all email flowed to and from an address utilized by Reed.[1]

Myers is the CEO and 100% owner of RCC, an entity founded in 1987 to "acquire, develop, own and manage investment-grade commercial and residential real estate projects." Myers is also the co-CEO and 52% owner of RCP, a commercial real estate investment firm founded in 2000. Myers oversees the operations of both RCC and RCP.

---

1. Dr. Cravens acknowledged at trial that if Reed's name was on an email, it could be assumed that Dr. Cravens had seen it.

Rian joined RCC in 2005. Working as a developer, with a background in engineering, he eventually held the title of vice-president. Rian's twin brother is Rory Maguire. As the vice-president of acquisitions for RCP, Rory was responsible for sourcing potential investment opportunities for RCP.[2]

Lake joined RCC as a developer in 2006 and held the title of executive vice president. He left RCC sometime in the spring or summer of 2008 to operate his own development company, Principal Property Resources (PPR), but he continued to work on several projects that he had been involved with while at RCC, including the project in this case.

### B. Pre–February 15, 2008 Activities

Dr. Cravens began thinking about constructing a physician-owned neurosurgical hospital sometime in 2000 or 2001. He claimed that it was a way for him to "provide better patient care and be an advocate for patients," but he also acknowledged that the fees generated from owning the hospital would be "significantly more" than the fees collected by the CND, PA physicians.[3] Before 2007, Dr. Cravens had hired an architect to create renderings, had lined up an entity to operate the hospital (Matrx), had spoken to several local banks about financing, and had interviewed numerous people about the project, but he had not signed a development agreement.

Rory contacted Dr. Cravens in late April 2007, and the two met several times soon thereafter. Rory told Dr. Cravens about RCP, Myers, and RCP's line of work; he forwarded literature about RCP to Dr. Cravens; and he later provided Dr. Cravens with a nonbinding first Letter of Intent (LOI) that detailed the contours of the proposed transaction to construct a physician-owned hospital.[4] Dr. Cravens did not sign the LOI.

After several months, in September 2007, Rory again contacted Dr. Cravens, they met at a colleague's condominium, and Rory communicated both his and Myers's interest in the hospital project, explained that a developer would need to be hired, and recommended several developers, including Lake at RCC. Thereafter, Reed and a representative from Matrx met with Rory, who later introduced Lake to Dr. Cravens. According to Dr. Cravens and Reed, Lake said that he had developed a 20-acre hospital campus in Atlanta while working for Hillwood, that he had overseen an expansion at Baylor Grapevine Hospital while serving as Chairman of its board of directors, that Myers had banking relationships and a successful track record of developing and raising equity for these types of projects, and that RCC and RCP could secure the debt and equity financing for the project. Dr. Cravens turned over all of the hospital-related materials that he had collected by that point.

In November 2007, Dr. Cravens signed a second nonbinding LOI to develop and construct a physician-owned neurosurgical hospital. Unlike the first LOI, the second LOI identified RCC as the developer and provided for a developer fee. Dr. Cravens

---

**2.** Rory is not a party to this appeal.

**3.** According to Dr. Cravens, physician fees are those charged by the physicians for their services to the patients, such as performing an operation at the hospital, and hospital fees are institutional fees for things like "use of the operating room, the nursing staff, the ICUs, the hospital beds, medications[,] and so forth."

**4.** The figures contained in the first LOI came from Dr. Cravens. Among numerous other details, it identified Dr. Cravens as the developer and did not provide a figure in the space for a developer fee.

then met Rian, who like Lake, told Dr. Cravens about his background, including that he had been involved in several hospital construction projects (Arlington Memorial and Harris Southwest) as a professional engineer.[5]

Between mid-November 2007 and mid-February 2008, the parties worked towards finalizing the operative written agreements for the project. They contemplated that RCC would be the project's developer, that Dr. Cravens would be a limited partner in a newly formed limited partnership, that a lease agreement between the limited partnership and the CND, PA physicians would be signed and guaranteed by the physicians, and that Dr. Cravens would have the opportunity to buy the new hospital. Regarding financing, Lake expressed confidence that they could achieve an 80/20 debt-to-equity ratio—a figure that Dr. Cravens was pushing so that his anticipated equity position in the limited partnership would not be diluted, thus adversely affecting his chances of later purchasing the new hospital. Dr. Cravens had the understanding that RCP would be responsible for raising the equity portion of the financing.

As for the new hospital, the parties planned to locate it on the same parcel of land where CND, PA housed its existing medical practice (the Property). The Property was owned by Willmar Investments, Ltd.—a limited partnership that Dr. Cravens, the general partner, had previously created to own and hold property in trust for his children—but the parties contemplated that Willmar would contribute the Property to the new limited partnership. The original designs planned to locate a parking garage below the new hospital and to renovate the existing medical facility, but the parties had hopes of instead locating the garage on an adjacent property, increasing the size of the new hospital, and potentially demolishing the existing medical facility; Dr. Cravens and RCC were in discussions with the owner of the adjacent property, Dr. David Bruhl. Although he would later complain that several terms should not have been excluded from the written agreements, including deadlines for obtaining financing and completing construction, Dr. Cravens participated in the negotiation process, had the assistance of counsel, and made recommendations.[6]

## C. Written Agreements

The Partnership was formed effective February 15, 2008. The Partnership Agreement identified RCC as the developer, GenPar as the general partner, and Dr. Cravens as a Class A limited partner with a 99.8% limited partnership interest before payout.[7] The Partnership Agreement credited Dr. Cravens with a $3,320,000 initial capital contribution based on Willmar's future contribution of the Property, and it credited both GenPar and unidentified Class B limited partners with an initial capital contribution of $3,326.65 each.[8] The Partnership determined the $3,320,000 figure by subtracting the preexisting debt on the Property ($1.6 million) from its fair market value ($4.8 million), and it determined the 99.8% figure by dividing the value of Dr. Cravens's initial capital contribution ($3,320,000) by the total value of the

---

5. Around this time, Rory told someone in an email that RCC had "taken the reins on the deal with Dr. Cravens."

6. Dr. Cravens was told that the banks would not look favorably upon the terms he wanted to include.

7. Myers was president and Lake was vice-president of GenPar.

8. The Class B limited partners signed subscription agreements in December 2008.

capital contributions ($3,326,653.30).[9] GenPar and the Class B limited partners shared equally in the remaining .20% before-payout ownership interests. After payout, i.e, after Dr. Cravens recouped his initial capital contribution of $3,320,000 plus 10% per year, the sharing ratios would adjust to reflect that Dr. Cravens would receive 50% of the future profits, the Class B limited partners would collectively receive 49%, and GenPar would receive the remaining 1%. Thus, considering the difference between the before- and after-payout sharing ratios, Myers opined that the Class B limited partners stood to profit from the completion and sale of the hospital but doubted that they would profit if the hospital was not built.

The Partnership Agreement defined the project as "[t]he acquisition of the [p]roperty, and the development, construction and delivery to tenants of a fully operational ..., licensed and approved surgical/hospital." It contemplated a construction loan to finance the construction of the proposed hospital, required that the debt-to-equity ratio for any construction loan would be at least 80% debt with no more than 20% equity, and capped the total project cost at $28 million. It also provided for the acquisition of an interim loan "of approximately $3,100,000.00 [to be] incurred by the Partnership concurrently with the contribution of the [p]roperty to the Partnership [and to be used] to replace the indebtedness encumbering the [p]roperty and pay for certain development and pre-construction expenses."

Regarding management, the Partnership Agreement provided that "[t]he General Partner shall control the affairs of the Partnership and shall make all decisions affecting management of Partnership affairs." GenPar was given the express authority—"without first obtaining the consent of the other Partners"—to do the following, among other things:

- "execute such documents as it may deem advisable for Partnership purposes";
- "pay or reimburse from Partnership funds any legal, due diligence[,] and other formation fees or expenses of the Developer or the General Partner associated with the Project";
- "pay to the Developer an overhead and supervision fee of $1,239,113, which shall be payable in equal monthly installments during the Project";
- "upon closing of the Interim Loan, reimburse [Dr. Cravens] for up to [$500,000] of out-of-pocket pre-development costs expended with respect to the project"; and
- hire "any person to perform services in connection with the Project."

As for the limited partners, the Partnership Agreement provided that they shall not "take part in control or management of the business of or transact any business for the Partnership."

In addition to provisions for removing GenPar, ownership of Partnership property, and prior agreements, the Partnership Agreement contained the following provision regarding modifications: "This Agreement may be amended in writing by the General Partner and a majority (more than 50%) in Partnership Interests of the Partners." In light of these and other provisions, Dr. Cravens understood that while GenPar needed his permission to alter the terms of the Partnership Agreement (e.g., by obtaining financing with a

---

9. The $3,320,000 figure would later be used to reflect Dr. Cravens's equity contribution to the project.

debt-to-equity ratio other than 80/20), he had no authority thereunder to order GenPar to do such things as pay or not pay expenses associated with the project, approve or disapprove bank packets, or control the terms of GenPar's agreements with project consultants.[10]

Several other agreements were executed contemporaneously with the Partnership Agreement. Willmar's conveyance of the Property was governed by a Property Contribution Agreement.[11] As contemplated by the Partnership Agreement, Willmar agreed to contribute the Property to the Partnership, and GenPar agreed to obtain an interim loan in the amount of $3.1 million to pay off approximately $1.6 million of debt against the Property and to pay for development and preconstruction expenses.[12] Additionally, the Partnership and CNDH entered into a twenty-year lease of the existing medical facility and the future hospital facility that required CNDH to pay monthly rent to the Partnership.[13] Dr. Cravens and the other CND, PA physicians personally guaranteed CNDH's obligations under the Lease Agreement. Finally, Dr. Cravens and the Partnership entered into an Option Agreement that granted Dr. Cravens a one-time option to purchase the hospital from the Partnership at a certain point after CNDH began paying rent for the new hospital.

### D. Events Leading Up to Contribution of Property

The February 15, 2008 Contribution Agreement memorialized Willmar's agreement to contribute the Property to the Partnership, but Willmar did not contribute the Property at that time because the parties "didn't have all of the pieces in place." Matrx, the hospital operator that Dr. Cravens had lined up, backed out of the project sometime in April or May 2008. CNDH later signed a development and management agreement with Physician Synergy Group LLC (PSG) in August 2008.[14]

Ongoing discussions with Dr. Bruhl about locating a parking garage on his adjacent property transitioned from seeking to purchase his property to seeking to lease the property. Resolving the issue was important to the project because of its effect on the hospital's plans; if the parking garage was located on the adjacent property, then the construction plans would have to be altered to reflect the change. Dr. Cravens favored locating the parking garage on Dr. Bruhl's property because it would reduce construction costs and eliminate any potential for the hospital's operating rooms to experience vibrations from the garage.

10. Dr. Cravens expressly represented and warranted the following: "Such Limited Partner has such knowledge and experience in financial and business matters that the Limited Partner is capable of evaluating the merits and risks of an investment in the Partnership."

11. Dr. Cravens signed the Contribution Agreement on Willmar's behalf in his capacity as general partner of Willmar.

12. The Partnership had no other funds or capital; thus, securing the interim loan was tied to the contribution of the Property.

13. CNDH should not be confused with CND, PA, a different entity. According to Dr. Cravens, CNDH is owned 90% by the physicians in CND, PA and is the entity that would own the new hospital and collect the hospital fees.

14. PSG would be responsible for managing the hospital if it was built. According to Michael Conroy, PSG's vice president of finance, the development aspect of PSG's agreement with CNDH called for PSG to assist with the FF & E (furniture, fixtures, and equipment), "the architectural," "getting everything up to code," hiring employees, and drafting bylaws.

As for financing, in July 2008, NorthStar Bank of Texas submitted a term sheet for a $3.1 million interim loan and a term sheet for a $20.7 million construction loan in response to bank packets that Lake and Rian had assembled and sent out. The term sheet for the construction loan was based on the budget that Dr. Cravens had previously developed and the drawings that he had turned over to RCC back in 2007 when he signed the second LOI. The August and September 2008 organizational meeting minutes for CND, PA indicated the potential for obtaining a loan from Compass Bank.

### E. Property Contributed and Interim Loan Funded

Willmar contributed the Property to the Partnership on October 1, 2008. Around the same time, the Partnership obtained a $3.1 million interim loan from NorthStar Bank. Using the proceeds of the interim loan, the Partnership paid off approximately $1.6 million in preexisting debt against the Property, paid Dr. Cravens $484,429.59 for expenses that he had incurred in the past, and reimbursed RCC $31,960 for assembling the written agreements and loan documents.[15] After the payments to lenders and Dr. Cravens, the Partnership had about $1 million remaining, which Dr. Cravens understood was "seed money" for developing the project. Thus, the Partnership now held title to the Property, and the $1.6 million in debt against the Property that Willmar had owed was replaced with $3.1 million in debt against the Prop-

erty that the Partnership owed.[16] The Partnership also began paying Lake and RCC a monthly developer fee in the amount of $25,000, as permitted by the Partnership Agreement. CNDH paid monthly rent to the Partnership for use of the existing medical practice building.

### F. January to May 2009 Project Development

Beginning in January 2009 and continuing into late spring 2009, Dr. Cravens, Lake, Rian, and Reed held weekly meetings with numerous consultants (architects, engineers, and a general contractor) in furtherance of the project. One major topic concerned the revised construction plans that had to be prepared. Lake had secured a ground lease of Dr. Bruhl's adjacent property in late January 2009, so at that point, the parties could move forward on their plan to locate the parking garage on the adjacent property. The parties also worked on pro formas, which Conroy from PSG was ultimately responsible for preparing, and the debt and equity bank packets that would be sent out to elicit financing for the project.[17] Dr. Cravens wanted to expedite the development process because of the potential for legislation prohibiting physician-owned hospitals.

### G. Bank Packets, Economic Climate, and Development Fees

Dr. Cravens began inquiring about the status of the bank packets in March 2009, and by May 2009, he was "beginning to get pretty frustrated" that they had not been sent out.[18] Dr. Cravens's frustration con-

---

15. Throughout the trial, the parties and witnesses referred to the $484,429.59 as $500,000.

16. The interim loan was secured through a first lien deed of trust executed by the Partnership.

17. A pro forma is a financial projection of the completed hospital's performance over a cer-

tain period of time. The bank packets contained a description of the hospital, the economics of the deal, the sponsorship, the local market, and the city data—"just kind of the whole gamut of information to make sure that everybody gets all the proper data points."

18. Dr. Cravens recalled that Lake and Rian had told him that they were working "to get the bank packet as good as [they] could get it

tinued when in early May 2009, Lake and Rian told him that the economic climate had changed, that the banks' lending practices had become more stringent, and that he would therefore have to accept something other than an 80/20 debt-to-equity ratio—potentially a 65/35 or 60/40 finance structure.[19] Dr. Cravens drafted a letter to memorialize the discussion, lamenting that something other than an 80/20 finance structure would (1) dilute his ownership position, (2) reduce the amount of distributions he received in the future, and (3) make it impossible for him to purchase the hospital. Shortly thereafter, in a May 15, 2009 letter addressed to Lake, Dr. Cravens stated that he "believe[d] in [Lake's] ability to make the current arrangement happen," that it was "in both our best interest[s] for the current structure to go forward," and that the bank packets needed to go out by the end of the month, but he also warned, "I do not agree to [the] dilution of my equity position, but I am willing to discuss a renegotiation of our agreement. I expect a resolution in the next 45 days or I will need to terminate the current agreement."[20]

According to Dr. Cravens, Myers contacted him after the May 15, 2009 letter and assured him that they would close on a construction loan by either the end of September or early October 2009. It was also around this time that Dr. Cravens learned that RCC had recently hired Holliday Fenoglio Fowler (HFF), a large mortgage and investment sales group, to help assemble the bank packets and raise both the

debt and equity financing for the project. Rian recalled that RCC had hired HFF because Myers had thought, "With these economic times, let's go with the biggest in the country. We're going to put as many fingers out there and find every source of debt and equity possible for this project in order to present the best package to Dr. Cravens."[21] In addition to HFF's efforts, RCP began working to obtain additional equity financing in the form of EB–5 capital, a type of foreign investment visa program used in some domestic real estate ventures. RCP never entered into any agreement to provide equity financing for the hospital project.

In early June 2009, Lake and RCC provided Dr. Cravens with the Partnership's financial records, and Dr. Cravens claims that he learned for the first time that RCC and Lake had been paying themselves developer fees. The Partnership Agreement expressly allowed for the payment of developer fees, but Dr. Cravens was under the impression that they would not be paid until a construction loan was secured.

On June 8, 2009, Myers forwarded the bank packet to Dr. Cravens for final review. Myers stated that "[a]lthough the current financing market is not ideal, our goal remains that we achieve 80% debt and we will submit to you all competitive financing offers." But he also notified Dr. Cravens, "If we are not able to achieve an acceptable financing structure we are willing to delay construction of the hospital until the market improves. That being

---

in order to present [it] to the bank so [they] could get the best deal."

**19.** Rory recalled that the subprime mortgage crises began sometime in the spring of 2007, and by the fall of 2008, "we were in the middle of a financial crisis, meltdown." Dr. Cravens acknowledged in May 2009 that "this [was] a very unique time in the financial industry."

**20.** It was the first time that Dr. Cravens had threatened to stop the project.

**21.** Lake and Rian contacted NorthStar Bank sometime in May 2009 to follow up on the term sheet that it had issued for a construction loan back in July 2008, but the bank was no longer interested in pursuing the deal.

said, it is our goal to move the development forward immediately, and we know that is your goal as well." Dr. Cravens responded two days later that he hoped Myers had not "delayed this project intentionally in hopes that the market would have already changed," that he intended "to have financing secured in accordance with what we have discussed and formalized, which is an 80/20 deal," and that he "cannot wait for the market to improve." Myers responded to Dr. Cravens,

> Please be assured that we have no interest whatsoever in delaying this project. Every day that goes by costs us money as the developer, since the preferred return on the equity continues to grow. What I meant to convey in my letter was that we are going to work hard to structure the construction financing so it has approximately 80% debt and 20% equity. If we don't reach the 80% debt mark, we need your permission to enter into financing with lower debt levels. We know that you are keen on maximizing the debt portion of the financing, so I was just stating that we would need to delay the project if you didn't approve of the lower debt levels. By your letter, it sounds like all parties are highly motivated to start construction on the project and will consider all reasonable financing structures.

The debt and equity bank packets were sent out in late June 2009.[22] HFF projected closing on the construction loan by the end of September 2009 and delivering the completed hospital in December 2010.

## H. IronStone Bank and Construction Loan Efforts

Steven Heldenfels at HFF recalled that in the summer of 2009, banks were lending at debt-to-equity ratios between 60/40 and 65/35. So when IronStone Bank submitted a term sheet in mid-August 2009 that contained a loan amount for 75% of the total project cost, HFF and RCC decided to focus their efforts on IronStone.[23]

Ultimately, the time spent pursuing a construction loan took much longer than expected. Ironstone's chief credit officer reviewed the project several times, but each time the bank came back with more requests for information. According to Heldenfels,

> We thought we had a reasonable chance. They came back and asked a lot of questions, and we kept answering them. And we kept getting down to the end where they said, "Hey, I think we can get this done." And then we would do one more thing and do one more thing, and we thought we had a reasonable chance.

Ironstone's term sheet contemplated receiving a one-year construction-completion guaranty from RCC, the Partnership, GenPar, Myers, and CND, PA's physicians, but IronStone later asked for guaranties from these same individuals and entities for the life of the loan.[24] At some point, IronStone even wanted to see revised pro forma projections. Rian did not consider Ironstone's requests for information unreasonable, but he opined,

---

**22.** HFF indicated that the debt packet would be sent to 41 different capital sources and that the equity packet would be sent to 105 different capital sources.

**23.** The debt packet contained a total project cost of $30,847,803. Ironstone's term sheet reflected a loan amount of $23,136,000.

**24.** IronStone also wanted joint and several guaranties of the Lease Agreement from CND, PA's physicians.

During this time, as ·.... we've heard, the recession was in full force, and underwriting was increasingly difficult for any lender that was still willing to underwrite. And· they [IronStone] felt [that] because many. of the banks were not in good positions to loan dollars, if they were, they could ask for more ... than they. had been in the past, less competition." .

Frustrated that a construction loan had not yet been approved but that developer fees were continuing to be paid, Dr. Cravens instructed Myers in late September 2009 to "cease any further payment of fees or disbursement of. funds concerning this project until such time as a loan document is in place and executed and construction funding received:" Myers replied that Ir-onStone had "requested and received an enormous amount of documents between PSG, CND, and RCC, all of which [were] important in order to receive the commitment letter," and that they were continuing to provide additional information to IronStone. Myers also said that if RCC did not receive a construction loan commitment letter in October 2009, then it would stop paying itself and the consultants for any work that was not yet complete. Dr. Cravens re-urged a request that he had made to meet with IronStone himself, and he indicated that he wanted to have a construction loan in place by the end of the month.[25]

Dr. Cravens met with IronStone representatives on October. 14, 2009. He left the meeting with the impression that they did not fully understand the difference between physician fees and hospital fees. In a follow-up letter. to Myers, Dr. Cravens recommended giving IronStone "one more week. After October 23[rd] I think it is appropriate to conclude our discussions about ending our agreement and respectfully moving forward." According to Dr. Cravens, Myers, Lake, and Rian had been assuring him that they would secure the construction loan.

About a week later, IronStone sent a credit memo to certain people indicating that it had additional concerns and still did not understand the Partnership's projected revenue.[26] IronStone consequently asked for "an additional $3 million of liquidity in the guarantee" from the CND, PA physicians and sought information from Dr. Cravens about Willmar and other trusts that were listed on his financial statement. Dr. Cravens was willing to stand by the terms set out in Ironstone's term sheet, but he did not agree to provide additional liquidity or information about Willmar.[27] On November 4, 2009, Rodrigo Segura, Ironstone's point man, informed Rian that Ironstone would not be able to approve the construction loan without obtaining guaranties for the term of the construction loan from Willmar and four other trusts. Segura spoke with Dr. Cravens about the additional guaranties and recalled that "he was not willing to move forward in that direction." Dr. Cravens testified that he had concluded by late October 2009 that the project would not obtain a construction loan, but when Segura was asked whether

**25.** Dr. Cravens wrote, "I am trying to overcome what seems apparent, that this project with this bank is not going to· go forward."

**26.** IronStone had concerns about the additional equity financing. Med Properties Group in Dallas expressed interest in the equity investment side of the project, but they recommended a number of changes that were unacceptable to Dr. Cravens. The EB–5 investment that RCP had been working to secure fell through in late November or early December 2009.

**27.** Rian consequently attempted to secure a $2.5 million certificate of deposit as a pledge, but the effort never gained traction.

he considered the project over as of November 4, 2009, Segura said, "No. Underwriting was still continuing the process."[28]

## I. GenPar Removed

On November 6, 2009, Dr. Cravens held a meeting with himself and voted to remove GenPar as the Partnership's general partner and to elect Willmar in GenPar's place. In a letter dated the same day, Dr. Cravens informed Myers and Lake that GenPar had been removed at a meeting of 99.8% of the Partnership's limited partners "for fraudulent activities." In a follow-up letter to Myers and Lake, Dr. Cravens complained that GenPar had made decisions without his input, that he had been given "misleading information and ultimately fraudulent information regarding the bank funding and the level of review and the timing of the closing of the loan," that a bank representative had told him that the loan had been declined over six weeks earlier, and that Myers and Lake had failed to comply with the Partnership Agreement and had "caused material detriment" to the partnership.[29] Regarding the Partnership's general partner, Dr. Cravens later replaced Willmar with himself and then replaced himself with an entity called Center for Neurological Disorders, GP, LLC.

## J. Litigation

Dr. Cravens, the Partnership, Willmar, and CNDH sued Appellants in December 2009, seeking damages and attorneys' fees and alleging claims for common law fraud, statutory fraud, negligent misrepresentation, breach of fiduciary duty, aiding and abetting, breach of contract, conspiracy, promissory estoppel, unjust enrichment, and dissolution. At the time of trial, Dr. Cravens and the Partnership were the only plaintiffs; the clerk's record includes an order granting partial summary judgment for Appellants and dismissing all of Willmar's and CNDH's claims with prejudice.[30]

In addition to the evidence discussed above, Dr. Cravens testified at trial that he sued Appellants to stop them from spending the Partnership's money and lying to him. Reed testified that RCC or Lake were paid $360,000 in developer fees.[31] Glen Hahn, one of Dr. Cravens's experts, testified that Appellants improperly guided the project by spending approximately $975,000 on construction drawings and consultants when there was no construction loan in place and by incurring debt on the Property that had to be repaid.[32] Wayne Ruhter, another expert, testified that Dr. Cravens would have received (i) approximately $5 million in profits if the hospital had been built and Dr. Cravens had bought it and (ii) $893,052 in profits from his interest in the Partnership before he purchased the hospital. Dr. Ruhter also opined that CNDH would have profited in the amount of approximately $19

**28.** Three months later, Segura notified Rian via email that "Ironstone Bank continues its interest in considering construction financing for the project" but that it still required the items that it had requested on November 4, 2009.

**29.** Dr. Cravens testified that he thought Ironstone's requests for more and more information were a ruse.

**30.** The RCP Appellants state in their brief that although the partial summary judgment order reflects a dismissal with prejudice against CNDH and Willmar, CNDH and Willmar had voluntarily nonsuited their claims before the trial court signed the partial summary judgment order. Regardless, neither CNDH nor Willmar was included within the jury charge or awarded damages in the final judgment.

**31.** RCC and Lake were paid developer fees in November and December 2009.

**32.** HFF was never paid for its services.

million had the hospital been built and operated for twenty years.[33]

The trial court submitted the case to the jury in a charge with forty-eight questions. The jury returned a 10-to-2 verdict for Dr. Cravens and the Partnership that included affirmative liability findings against Lake, Rian, RCC, and RCP for fraudulent inducement and statutory fraud prior to the date of the Partnership Agreement; against Myers for statutory fraud; against Lake, GenPar, and RCC for fraudulent inducement by nondisclosure between the date of the Partnership Agreement and the date that Willmar conveyed the Property to the Partnership; against Lake for a securities law violation and Myers and RCC for materially aiding Lake in committing the securities law violation; against RCC for promissory estoppel; against Lake and RCC for unjust enrichment; and against GenPar for breach of the Partnership Agreement. Relevant to this appeal, the jury's damage awards included $3,558,000 for fraudulent inducement and statutory fraud prior to the date of the Partnership Agreement; $3,558,000 for fraudulent inducement between the date of the Partnership Agreement and the date that Willmar contributed the Property to the Partnership; $1,548,000 for promissory estoppel; $317,500 for unjust enrichment; and $1,625,000 in trial and appellate attorney's fees.

The final judgment states that Dr. Cravens and the Partnership made an election of remedies, choosing to recover for fraudulent inducement, statutory fraud, promissory estoppel, and unjust enrichment.

The judgment awards damages of $8,664,000 to Dr. Cravens in his individual capacity and damages of $317,500 to the Partnership. The judgment also awards $1,625,000 to Dr. Cravens individually for trial and appellate attorney's fees and contains a judicial declaration that GenPar was properly removed as general partner of the Partnership.[34]

### III. STANDING

■ The RCC and RCP Appellants argue in their respective first issues that Dr. Cravens lacks standing to recover damages in his individual capacity. They contend that he was not personally aggrieved and did not personally incur any harm or loss because he neither made any investment in, nor transferred anything of value to, the Partnership. Any legal right to recover damages instead belonged to Willmar, CNDH, or the Partnership, Appellants argue, because Willmar, not Dr. Cravens, contributed the Property to the Partnership and because CNDH, not Dr. Cravens, paid rent to the Partnership under the Lease Agreement. Appellants misconstrue what it means to be personally aggrieved.

■ Standing is a component of subject matter jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex.1993). If a party lacks standing to bring an action, then the trial court lacks subject matter jurisdiction to hear the case. *Id.* at 444–45. If a court lacks subject matter jurisdiction to hear a case, then it lacks authority to decide that case. *M.D. Anderson Cancer Ctr. v. No-*

---

33. Dr. Cravens owned an interest in CNDH; therefore, he would have received some amount of the $19 million figure over the course of twenty years. The record does not contain a copy of CNDH's partnership agreement.

34. The award of attorney's fees to Dr. Cravens was based on the statutory fraud theory. *See* Tex. Bus. & Com.Code Ann. § 27.01(e) (West 2015) (providing for recovery of "attorney's fees, expert witness fees, costs for copies of depositions, and costs of court" for statutory fraud).

*vak,* 52 S.W.3d 704, 708 (Tex.2001). We therefore review a claimant's standing de novo. *Tex. Dept of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 646 (Tex. 2004).

The requirement of standing is implicit in the open courts provision of the Texas Constitution and contemplates access to the courts only for those litigants who suffer an injury. *Novak,* 52 S.W.3d at 708. In Texas, the standing doctrine requires a concrete injury to the plaintiff and a real controversy between the parties that will be resolved by the court. *Daimler-Chrysler Corp. v. Inman,* 252 S.W.3d 299, 307 (Tex.2008); *see Neeley v. W. Orange-Cove Consol. ISD,* 176 S.W.3d 746, 774 (Tex.2005). This test parallels the federal test for Article III standing—"A plaintiff must allege a personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Heckman v. Williamson Cty.,* 369 S.W.3d 137, 154 (Tex.2012) (citing *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)).

Given the parallels between the tests, our supreme court has looked for guidance from the United States Supreme Court, which has stated "that the irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted); *see Heckman,* 369 S.W.3d at 154–55. Appellants' arguments implicate the first element: "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136 (citations omitted). We often summarize this first element of standing by simply stating that "a plaintiff must be personally aggrieved," *see, e.g., Daimler-Chrysler Corp.,* 252 S.W.3d at 304, but the inquiry necessarily turns upon the notion of *injury.*

The RCC Appellants argue as follows:

Dr. Cravens' primary claim is that the failure of the Project caused him harm. Review of the jury's *damages* award, as incorporated in the Final Judgment, must therefore focus on the nature and value of Dr. Cravens' "investment" in the Partnership. If he made no investment, or transferred no value, he cannot have suffered an individual loss. [Emphasis added.]

Similarly, the RCP Appellants argue as follows:

Here, Cravens did not personally part with anything of value. He did not pay any money or contribute any property to the Partnership, RCP, or Richard Myers. Rather, the record conclusively establishes that the only exchanges of money or property took place when (1) Willmar Investments contributed real property to the Partnership, (2) Center for Neurological Disorders paid rent to the Partnership, and (3) the Partnership reimbursed Cravens $500,000 for his "pre-development" costs incurred before the Partnership Agreement was ever signed . . . .

Cravens sought and recovered *damages* for the value of what other entities contributed to the Partnership and lost profits that he purportedly would have received as a limited partner in the Partnership had the hospital been completed and operational . . . . [Emphasis added.]

Appellants thus connect the *injury* that Dr. Cravens must have suffered for purposes of having standing with the *damages* that he either sought or was awarded by

the jury. In this particular context, that is improper.

■ As the Supreme Court of Connecticut has astutely noted,

The concept of "damages" ... is distinct from the legal injury from which damages arise. " 'The word "injury" denotes the illegal act; the term "damages" means the sum recoverable as amends for the wrong. The one is the legal wrong to be redressed, the other the scale or measure of recovery.' "

*Goodyear v. Discala,* 269 Conn. 507, 849 A.2d 791, 799–800 (2004) (citations omitted). Another appellate court in the same state later explained that "an inability to establish the exact amount of damages is indicative of a defect in a plaintiff's capacity to prove his or her case, not a deficiency in the court's subject matter jurisdiction." *Weiner v. Clinton,* 100 Conn.App. 753, 919 A.2d 1038, 1041, *cert. denied,* 282 Conn. 928, 926 A.2d 669 (2007).

The Supreme Court of California also touched on the distinction between a plaintiff's injury and his alleged damages in an appeal involving a suit by indirect-purchaser pharmacies against drug manufacturers:

While Manufacturers argue that ultimately Pharmacies suffered no compensable loss because they were able to mitigate fully any injury by passing on the overcharges, this argument conflates the issue of standing with the issue of the remedies to which a party may be entitled. That a party may ultimately be unable to prove a right to damages ... does not demonstrate that it lacks standing to argue for its entitlement to them. The doctrine of mitigation, where it applies, is a limitation on liability for damages, not a basis for extinguishing standing. This is so because mitigation, while it might diminish a party's recovery, does not diminish the party's interest in proving it is entitled to recovery.

*Clayworth v. Pfizer, Inc.,* 49 Cal.4th 758, 111 Cal.Rptr.3d 666, 233 P.3d 1066, 1087 (2010) (citations omitted).

This reasoning is by no means foreign to Texas jurisprudence. Our supreme court has explained that "[a] plaintiff does not lack standing simply because he cannot prevail on the merits of his claim; he lacks standing because his claim of injury is too slight for a court to afford redress. *DaimlerChrysler Corp.,* 252 S.W.3d at 304–05; *see Weiner,* 919 A.2d at 1041 ("A claim's justiciability is wholly separate from its merits."). Likewise, in *AVCO Corp. v. Interstate Southwest, Ltd.,* a complex commercial litigation case involving numerous parties and issues, one of our sister courts in Houston more specifically explained that "causation and damages are matters of proof, and the determination of standing does not require a plaintiff to 'put on its case' simply to establish jurisdiction." 251 S.W.3d 632, 654 (Tex.App.–Houston [14th Dist.] 2007, pet. denied) ("Because review of such matters would require consideration of evidence discussed *infra* that 'goes to the heart of the merits,' we recognize ISW's standing to pursue its claims to judgment.").

■ This dichotomy between the existence of a party's injury and its damages or potential remedies is only reinforced when we consider several other categories of justiciability. *See Isenbarger v. Farmer,* 463 F.Supp.2d 13, 22 (D.D.C.2006) ("[L]egal commentary has suggested that the 'multiplicity of justiciability doctrines contain many overlapping tests' that address the common goal of ensuring that a plaintiff is legally entitled to relief based on a nonspeculative injury.") (citing Erwin Chemerinsky, *A Unified Approach to Justiciability,* 22 Conn. L.Rev. 677, 682, 696–97 (1990)). "Ripeness, like standing, is a

threshold issue that implicates subject matter jurisdiction, and like standing, emphasizes the need for a concrete injury for a justiciable claim to be presented." *Patterson v. Planned Parenthood of Houston & Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998) (citation omitted). While standing focuses on the question of who may bring an action, ripeness examines when that action may be brought. *Id.* "[R]ipeness asks whether the facts have *developed sufficiently* so that an injury has occurred or is likely to occur, rather than being contingent or remote." *Id.* (emphasis added). "Standing and ripeness [thus] present the threshold jurisdictional question of whether a court *may* consider the merits of a dispute." *Elend v. Basham,* 471 F.3d 1199, 1204 (11th Cir.2006) (emphasis added).

In *Speer v. Presbyterian Children's Home & Service Agency,* the supreme court dismissed as moot an appeal involving whether the respondent was a religious corporation exempted from the general prohibition of discriminatory practices contained in our state's anti-discrimination statutes. 847 S.W.2d 227, 228, 230 (Tex. 1993). Disagreeing with the dissent's argument that dismissing the appeal "endors[es] ... evasion of our state prohibition against employment discrimination," Justice Cornyn explained that "[d]ismissal for mootness *is not a ruling on the merits.* Rather, the court's duty to dismiss moot cases arises from a proper respect for the judicial branch's unique rule under our constitution: to decide contested cases." *Id.* at 229 (emphasis added).

Appellants' arguments that Dr. Cravens lacks standing to recover individually are premised upon caselaw holding that an individual stakeholder in a legal entity cannot recover personally for harms done to the legal entity. *See, e.g., Nauslar v. Coors Brewing Co.,* 170 S.W.3d 242, 247 (Tex.App.–Dallas 2005, no pet.). That line of authority appears to derive from the supreme court's opinion in *Wingate v. Hajdik,* 795 S.W.2d 717, 719 (Tex.1990) ("A corporate stockholder cannot recover damages personally for a wrong done solely to the corporation, even though he may be injured by that wrong."). *Id.* Interestingly, however, not once do the terms "standing," "justiciability," or "subject matter jurisdiction" appear in the majority opinion. *Id.* at 718–20. Now–Chief Justice Hecht instead repeatedly phrased the issue as a matter of "recovering damages." *Id.*; *cf. Sneed v. Webre,* 465 S.W.3d 169, 186 (Tex. 2015) (considering whether the business judgment rule deprived respondent of standing to assert a derivative proceeding on behalf of a closely held corporation and observing that "[t]he defendants confuse standing with an issue that goes to the merits"—"[t]he right of a plaintiff *to maintain a suit,* while frequently treated as going to the question of jurisdiction, has been said to go in reality to the right of the plaintiff to relief rather than to the jurisdiction of the court to afford it") (emphasis in original). Consequently, our holding does not conflict with or alter in any way the well-established line of authority relied upon by Appellants. Rather, insofar as Dr. Cravens may have sought, and the jury may have improperly awarded, any damages that belong to the Partnership or some other entity, that issue is more appropriately raised through a direct challenge to the damages award, a merits-based inquiry, not via an argument premised upon a lack of standing, a jurisdictional inquiry.

Given all of the above, we decline Appellants' implied invitation to improperly conflate the standing requirement that Dr. Cravens suffer a personal injury with his ability or inability to recover damages that were arguably incurred by a different entity. Dr. Cravens pleaded and testified that

the RCC and RCP Appellants fraudulently induced *him* to enter into the Partnership Agreement by misrepresenting their ability to develop the project and obtain financing to construct a physician-owned neurosurgical hospital. We hold that Dr. Cravens met his initial burden to show that he was personally aggrieved by the acts or omissions of Appellants for purposes of demonstrating standing to recover damages individually. *See Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136; *Heckman*, 369 S.W.3d at 154–55; *DaimlerChrysler Corp.*, 252 S.W.3d at 305 (comparing facts to those in *Novak* and stating, "The point was that Novak was not *himself* deceived or injured, and therefore he did not have standing individually to assert fraud." (emphasis added)). We overrule the RCC and RCP Appellants' first issues.

## IV. STATUTORY FRAUD RECOVERY

■ The RCC Appellants in their issue 2a and the RCP Appellants in part of their second issue argue that the trial court erred by awarding Dr. Cravens final judgment on his statutory fraud claim under business and commerce code section 27.01. They contend that section 27.01 has no application to the facts of this case because (i) acquiring a partnership interest through an agreement that incidentally deals with real estate, as Dr. Cravens did here, is insufficient to bring the case within the scope of section 27.01 and (ii) Dr. Cravens was not a party to the Contribution Agreement in his individual capacity. The first argument views the transaction through an overly narrow lens. The second ignores a key aspect of the unique transaction formulated by the parties.

Business and commerce code section 27.01(a) creates a statutory cause of action for fraud in a real estate transaction. *See*

Tex. Bus. & Com.Code Ann. § 27.01. As relevant here, the claim requires a false representation that is made to induce a person to enter into a contract and that is relied on by that person in entering into the contract. *Id.* § 27.01(a)(1).

■ The Partnership Agreement was not the only document effective on February 15, 2008; the Contribution Agreement, the Lease Agreement, and the Option Agreement were executed the same day. Texas follows the "well established principle that, in order to ascertain the entire agreement between the contracting parties, separate documents executed at the same time, for the same purpose, and in the course of the same transaction are to be construed together." *Jim Walter Homes, Inc. v. Schuenemann*, 668 S.W.2d 324, 327 (Tex.1984). There can be no doubt that the Contribution Agreement memorialized a real estate transaction— specifically, Willmar's agreement to convey the Property to the Partnership. The actual contribution occurred six and a half months after the Partnership Agreement was executed, but the delay did not somehow transform the transaction into something other than one involving real estate. When we construe all of the agreements together, instead of individually and in a vacuum, the RCC and RCP Appellants' characterization of the transaction as one comprising only an acquisition of a limited partnership interest misses the mark.

The arguments that section 27.01 has no application because Dr. Cravens was not a party to the Contribution Agreement individually are more compelling but also ultimately unpersuasive.[35] As explained above, and as reflected by the Partnership and Contribution Agreements, the parties devised a unique transaction whereby Dr.

---

**35.** Insofar as this argument is a further variation of the same standing argument that we

addressed above, our analysis above provides additional support for our holding.

Cravens received a capital contribution credit in the amount of $3.32 million and a corresponding 99.8% limited partnership interest in exchange for Willmar's contribution of the Property. In other words, Willmar supplied the consideration for its end of the bargain, but the immediate benefit flowed to Dr. Cravens individually, not back to Willmar.[36] *See In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 129 (Tex.2004) ("As a rule, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy."). Because Willmar and the Partnership clearly intended to secure a benefit for Dr. Cravens and contracted directly for his benefit, we hold that Dr. Cravens was not prohibited from securing a judgment against Appellants individually for statutory fraud under business and commerce code section 27.01. *See MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 651 (Tex.1999) (describing contours of third-party beneficiary status); *AVCO Corp.,* 251 S.W.3d at 653–54 (holding that affiliate entity had standing to pursue fraudulent inducement claim as beneficiary of second addendum to master supply agreement). We overrule the RCC Appellants' issue 2a and this part of the RCP Appellants' second issue.

## V. Fraud Findings

The RCC Appellants argue in their third issue that the evidence is legally and factually insufficient to support (i) the jury's findings in question number 6 that Lake, Rian, and RCC committed statutory fraud against Dr. Cravens prior to February 15, 2008, and (ii) the jury's findings in question number 34 that between February 15, 2008, and October 1, 2008, Lake, GenPar, and RCC committed fraud by nondisclo-

sure against Dr. Cravens that induced him to sign a deed conveying the Property to the Partnership. Regarding question number 34, the RCC Appellants also argue in their issue 2b that the jury's findings are legally immaterial and should be disregarded because Texas does not recognize a separate tort of "continuing" fraud. The RCP Appellants argue in part of their second issue that the evidence is legally and factually insufficient to support the jury's findings in question numbers 6 and 7 that RCP and Myers, respectively, committed statutory fraud against Dr. Cravens prior to February 15, 2008.

### A. Standards of Review

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo,* 444 S.W.3d 616, 620 (Tex. 2014); *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998), *cert. denied,* 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas,* 228 S.W.3d 649, 651 (Tex.2007); *City of Keller v. Wilson,* 168 S.W.3d 802, 807, 827 (Tex. 2005).

---

**36.** One of the Contribution Agreement's recitals even stated, "[Willmar] desires to contribute the Land, Improvements, and all related personalty to [the Partnership] upon the for-

mation of [the Partnership], and in consideration thereof, [Dr. Cravens], the general partner of [Willmar] will receive certain interests in [the Partnership]."

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

### B. Question Number 6

The RCC and RCP Appellants argue that there is no evidence of an actionable misrepresentation that induced Dr. Cravens to enter into the Partnership Agreement. Dr. Cravens disagrees, arguing that Lake misrepresented that he had developed a hospital in Georgia and had overseen the expansion of a hospital in Grapevine while on that hospital's board; that Rian had misrepresented his involvement with two hospital projects as an engineer; that Lake, Rian, RCC, and RCP misrepresented their ability to obtain financing for the project and build the hospital; and that representations were made that developer fees would not be paid until the construction financing was secured. The alleged misrepresentations thus primarily fall into three categories: (1) past experience and qualifications, (2) intent to develop the hospital, and (3) when developer fees would be paid.[37]

An actionable representation is one concerning a material fact; a pure expression of opinion will not support an action for fraud. *Transp. Ins. Co. v. Fair-*

cloth, 898 S.W.2d 269, 276 (Tex.1995). "A material fact is one in which a reasonable person would attach importance to and would be induced to act on in determining their choice of actions." *Tukua Invs., LLC v. Spenst*, 413 S.W.3d 786, 798 (Tex. App.–El Paso 2013, pet. denied). "An honest but erroneous expression of opinion or b[e]lief is not fraud.... Since a statement concerning a matter not susceptible of exact knowledge by the speaker is no more than the expression of a belief, one making such a statement *in good faith* is not liable for its falsity." *Harris v. Sanderson*, 178 S.W.2d 315, 319 (Tex.Civ.App.– Eastland 1944, writ ref'd w.o.m.) (emphasis in original). Whether a statement is an actionable statement of "fact" or merely one of "opinion" often depends on the circumstances in which the statement is made. *Transp. Ins. Co.*, 898 S.W.2d at 276. Relevant circumstances include the statement's specificity, the comparative levels of the speaker's and the hearer's knowledge, and whether the statement relates to the present or the future. *Id.*

### 1. Past Experience and Qualifications

#### a. Lake

Lake testified that he did not tell Dr. Cravens that he had developed a hospital in Georgia or that he had overseen the development of the expansion at Baylor Grapevine. Dr. Cravens and Reed testified otherwise—when they met Lake in the fall of 2007, he represented that he had developed a hospital in Atlanta and had overseen the expansion at Baylor Grapevine. Lake made the representations before Dr. Cravens had signed the second LOI, and Dr. Cravens explained that he

---

**37.** At several points in his brief, Dr. Cravens refers to evidence of alleged misrepresentations that occurred after February 15, 2008. Jury question number 6 inquired about fraud prior to February 15, 2008; therefore, any alleged misrepresentations that occurred after February 15, 2008, are irrelevant to this analysis.

had no reason not to believe Lake— "Based upon what he said I believed him and I felt that he was somebody who was competent in being able to build a hospital based on what he shared with me." The representations were therefore specific and related to a past material fact of which Dr. Cravens had no knowledge.

The RCC Appellants argue that Dr. Cravens did not justifiably rely on Lake's statements because he had the advice of counsel and understood the dynamics of the deal and because the Partnership Agreement superseded all prior oral understandings between the parties. However, Dr. Cravens clarified at trial that he was complaining about representations that were *not* addressed in the Partnership Agreement but that induced him to enter into it, i.e., Lake's representations about his past experience.

■ The RCC Appellants also argue that Lake's representations were not actionable because they were nothing more than mere "puffing." " 'Puffery' is an expression of opinion by a seller not made as a representation of fact." *Dowling v. NADW Mktg., Inc.*, 631 S.W.2d 726, 729 (Tex.1982). Lake's representations were statements of material fact, not mere opinions. *See Harris,* 178 S.W.2d at 319.

We hold that the evidence is legally and factually sufficient to support the jury's finding in question number 6 that Lake committed statutory fraud against Dr. Cravens prior to February 15, 2008.

### b. RCC

■ The evidence is undisputed that Lake was a vice president of RCC and that he was acting in that representative capacity when he made the complained-of representations about his past experience developing hospitals. Appellees consequently sought to hold RCC liable for the alleged misrepresentations committed by Lake.

The parties make no effort on appeal to explain under what specific theory of vicarious liability Appellees sought to hold RCC liable, but based on Appellees' pleadings and arguments, it appears that they proceeded under a principal/agent theory. *See Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.,* 337 S.W.3d 846, 853–54 (Tex.2011) (reasoning that an agent's act on behalf of the organization is an act of the organization itself); *LandAmerica Commonwealth Title Co. v. Wido,* No. 05–14–00036–CV, 2015 WL 6545685, at *5 (Tex.App.–Dallas Oct. 29, 2015, no pet.) (mem. op. on reh'g) ("Any recovery against a principal for a tort must be based on the wrongful act of an officer or agent within the course or scope of his employment."); *Sw. Bell Tel. Co. v. Wilson,* 768 S.W.2d 755, 759 (Tex.App.–Corpus Christi 1988, writ denied) ("A principal is responsible for an unlawful act of his agent where the act is committed by the agent for the purpose of accomplishing the mission entrusted to him by his principal."). The evidence is legally and factually sufficient to support the jury's finding in question number 6 that RCC committed statutory fraud against Dr. Cravens prior to February 15, 2008, based on Lake's acts as RCC's vice president. We overrule this part of the RCC Appellants' third issue insofar as it relates to RCC.

### c. Rian

■ Dr. Cravens testified that Rian said that he had worked as a civil engineer and project manager on a renovation at Harris Southwest Hospital and an expansion at Arlington Memorial Hospital. Rian testified,

Q. Would you describe those hospital projects for us? Start with the first one that you were involved with.

A. .... From there Harris Southwest, which is in southwest Fort Worth,

went through a pretty good size expansion, and *I did ... most of the ... land development engineering for that project under a—*

. . . .

A. And so worked on that expansion underneath another professional engineer who was my boss at the time. And then we both started work on the new JPS patient tower in Fort Worth, and fairly simultaneously with that we started work on the new Arlington Memorial tower in Arlington. And through the course of that design, which each one of those projects took over two years, I think, through the course of that design and working with the other consultants, *I became the lead engineer on both of those projects* before I left [my employer].

Q. Which two projects are you referring to?

A. The JPS patient tower and the Arlington Memorial tower. Both of those projects ... were well over 50 million.

Q. You said you ... became the lead engineer?

A. Yes, *project manager* for the civil engineering. [Emphasis added.]

We fail to see how Rian's testimony is any different from Dr. Cravens's testimony.

■ Dr. Cravens appears to argue that Rian misrepresented his experience by *omitting* the fact that he worked outside the "footprint" on the Harris Southwest project instead of inside the footprint. A civil engineer who focuses on land development engineering, as Rian did, is necessarily responsible for various matters that are primarily located outside the footprint of a project. Rian testified, "I'll hone in on land development engineering, which is really where I ... specialized, and that was doing the civil engineering work for new construction, which would involve any water, sewer, storm drain, grading, paving, dimensional control, layout and specifications for essentially everything outside of the building footprint." To the extent that Dr. Cravens's apparent nondisclosure argument does not conflict with jury question number 6, it is unpersuasive because there is no evidence that Rian *knew* that Dr. Cravens did not understand the duties of a civil engineer or that Rian was *deliberately silent* about the specific responsibilities of a civil engineer who focuses on land development.[38] Insofar as the jury's finding in question number 6 that Rian committed statutory fraud is based on any representations that he made regarding his past experience or qualifications, the evidence is legally insufficient to support that finding.

### 2. Intent to Develop the Hospital

■ Dr. Cravens testified several times that Lake, Rian, Rory, or Myers represented to him that they could, and would, secure the debt and equity financing that was needed to construct the hospital and, consequently, make Dr. Cravens's dream of owning a neurosurgical hospital a reality:

● [Lawyer]: Tell the jury today why you went into partnership with Realty Capital Corporation or anyone associated with Realty Capital or Realty Capital Partners.

. . . .

---

**38.** Among other things, fraud by nondisclosure requires evidence that the defendant knew the plaintiff was ignorant of the facts and that the defendant was deliberately silent when he had a duty to speak. *Reservoir Sys., Inc. v. TGS–NOPEC Geophysical Co., L.P.,* 335 S.W.3d 297, 304 n.6 (Tex.App.–Houston [14th Dist.] 2010, pet. denied).

[Dr. Cravens]: My ... original reasons for going into this agreement was they were to obtain equity funding and to get a construction loan for me to build this hospital.

● [Lawyer]: Okay. Why did you sign those documents?

[Dr. Cravens]: Because I wanted to build this hospital. I believed what they told me they would do. I believed that they had the expertise that they told me they had. I believed it when they told me they could raise the equity.

[Lawyer]: Okay. Do you believe them telling you that they could find construction financing?

[Dr. Cravens]: Yes, sir.

[Lawyer]: That they could find the equity or they would raise the equity?

[Dr. Cravens]: Yes, sir.

● [Lawyer]: Okay. May of 2007, you met with Rory Maguire. Do you have any complaints about what Mr. Maguire may have said or done after you met with him, Rory Maguire?

[Dr. Cravens]: Rory Maguire represented to me RCP would raise equity for this project. They liked the project, that's what they do, they could raise the equity and do this project.

● [Lawyer]: What about Mr. Myers?

[Dr. Cravens]: Mr. Myers, through Rory, Rian, Darrell Lake, represented to me that he had the ability, he could raise the money and us do this deal, the development as well as the equity funding.

● [Lawyer]: Okay. Did Mr. Lake ... say anything to you about Mr. Myers, prior to the execution of any documents, and his relationship to RCC and the development of this project?

[Dr. Cravens]: I was told that Mr. Myers was essentially a financial genius, raising equity and doing developments. He wanted to do this project. He could get the equity funding, and he had the development team to build this hospital.

Reed testified similarly:

● [Lawyer]: Okay. At either the first meeting or the second meeting, did Mr. Maguire, Rory Maguire, now, did he tell you anything that he wanted to do or was capable of doing?

[Reed]: Oh, yeah, be able to get the money, be able to get the construction and equity financing for the project to become a reality for Dr. Cravens.

● [Lawyer]: Okay. Did he talk to you—Mr. Lake, did he talk to you about his relationship with Mr. Myers or any company that was associated with Mr. Myers?

[Reed]: The conversation was with regard to Realty Capital with Mr. Myers' name coming up, that he had a number of banking relationships and that they had access to money pretty freely, that they would be able to bring the funds to the project, and [Lake], with his development expertise, would be able to help us develop it.

At best, Appellants' representations are nothing more than promises of future performance; at worst, they are nonactionable statements of opinion or puffing.[39]

The generally accepted rule is that predictions and conjectures relating to future events cannot serve as actionable fraud. *Precision Motors, Inc. v. English*, 517 S.W.2d 371, 372 (Tex.Civ.App.–Beaumont 1974, no writ); *see Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986) ("Failure to perform, standing alone, is no evidence of the promissor's intent not to perform when the promise was made.").

39. Dr. Cravens agreed that he was not defrauded because Appellants were optimistic.

However, a promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998).

There is no evidence that any of the RCC or RCP Appellants did not intend to obtain financing or did not intend to build the hospital when they made the representations to Dr. Cravens. In fact, the evidence conclusively proves just the opposite. In addition to a substantial amount of testimony about the project, the trial court admitted hundreds of exhibits at trial that, if nothing else, reveal the staggering, two-year effort that numerous individuals and entities put forth towards making the hospital a reality. In the end, it was Dr. Cravens who (i) construed Ironstone's credit memo to mean that IronStone was denying the request for debt financing and (ii) removed GenPar as the Partnership's general partner. Accordingly, insofar as any of the jury's findings in question number 6 are premised upon representations about obtaining debt or equity financing or building the hospital, the evidence is legally insufficient to support the finding.

### 3. Timing of Developer Fees Payments

■ Dr. Cravens testified that before he signed the Partnership Agreement, he was told that developer fees would not be paid until the construction loan was secured. As it turns out, GenPar began paying developer fees after the interim loan was obtained in October 2008. The RCC and RCP Appellants argue that in light of the circumstances surrounding the execution of the Partnership Agreement and several provisions contained therein, Dr. Cravens could not have justifiably relied on the alleged oral representations regarding the developer fees as a matter of law. We are compelled to agree.

■ In addition to several other elements, jury question number 6 stated that statutory fraud occurs when "the false representation is relied on by that person in entering into that contract." Indeed, reliance is a necessary element of a statutory fraud claim, and we assume that the reliance must have been justifiable. *Matlock Place Apartments, L.P. v. Druce*, 369 S.W.3d 355, 373 (Tex.App.–Fort Worth 2012, pet. denied). "In measuring justifiability, we must inquire whether, 'given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part.'" *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex.2010) (quoting *Haralson v. E.F. Hutton Grp., Inc.*, 919 F.2d 1014, 1026 (5th Cir.1990)). In other words, a person may not justifiably rely on a representation if there are "red flags" indicating such reliance is unwarranted. *Id.*

The project was Dr. Cravens's first attempt to build a hospital, and he was unfamiliar with several technical terms associated with the process of obtaining debt financing, but the record reflects that he was no stranger to real estate and business entities. Dr. Cravens or an entity that he is associated with own a number of real estate properties, including the Flatiron Building in downtown Fort Worth, a hotel and restaurant located adjacent to the Flatiron Building, and a small apartment building in New Orleans. A limited partnership is a tenant of the Flatiron Building, and two different limited partnerships own the hotel and the restaurant. Dr. Cravens is associated in some capacity with all three partnerships. Further, Dr. Cravens does business through, and is the

president of, CND, PA, a professional association. CND, PA is a limited partner in an entity called CyberKnife. Dr. Cravens testified,

> Q. You have a good depth of experience being involved with business entities such as limited partnerships, professional associations, trusts and limited liability companies?
>
> A. The—my practice and the two entities that you described, Flatiron and the hotel, yes, sir.
>
> Q. And it covers, if I remember correctly, a period of now 22 or 23 years or more?
>
> A. Yes, sir.

Dr. Cravens was presented with two nonbinding LOIs before he signed the Partnership Agreement. The first LOI contained a blank space where a fee for the developer was to be set out, but the second LOI stated, "The Developer shall also be entitled to an overhead fee of two percent (2%) . . . and a supervision fee in the amount of four percent (4%) . . . of the total hard and soft project costs, which shall be payable in equal monthly installments during the Project." Dr. Cravens signed the second LOI.

During the period when the parties were working to formalize the Partnership Agreement, Dr. Cravens was represented by counsel and had an equal opportunity to provide input and make suggestions to the Partnership Agreement. He testified:

> Q. Do you recall that there was a back and forth process among [your]

attorney and the attorney that was working for the RCC group where the drafts were exchanged, people made changes, there were red lined versions and all of that?

> A. Yes, sir[.] . . .
>
> Q. Okay. And you remember that?
>
> A. Yes, sir.
>
> Q. You had your input into this document; right?
>
> A. That is correct.

Like Dr. Cravens, Reed confirmed that the parties exchanged drafts of the Partnership Agreement over a period of weeks and that Dr. Cravens and his attorney had ample opportunity to review and comment on the document.

The Partnership Agreement specifically addressed the payment of developer fees during the project in no less than two separate, conspicuous sections. Section 3.01.2(x) permitted GenPar to "pay the Developer an overhead and supervision fee of $1,239,113, which shall be payable in equal monthly installments during the Project." And section 1.02.3 provides,

> The General Partner, the Developer, and their respective affiliates may earn fees from the Partnership or any subsidiary of the Partnership, and otherwise with respect to the Project; *provided*, that as of the date of this Agreement, only the development fees and reimbursement for out-of-pocket expenses have been approved by the Partners . . . .[40]

---

40. Rian recalled that the project would take about two years to complete—about a year for preconstruction and a year for construction. When the $1.2 million developer fee figure set out in section 3.01.2(x) is divided by twenty-four months, the monthly installments over two years equals approximately $50,000. When asked why GenPar paid developer fees beginning in October 2008 of $25,000—approximately *half* of the figure that was contemplated by the Partnership Agreement—Rian said that they had "looked at the cash flow of the project alongside the loan, and we knew we couldn't do equal monthly installments [of $50,000] . . . the partnership would run out of funds. And so we did what we thought was reasonable."

· Finally, the Partnership Agreement contains several provisions that do not directly address payment of developer fees but are relevant to the justifiable reliance inquiry. Section 10.01.1 states, "Such Limited Partner has read in full and completely understands the terms of this Agreement, understands the investment objectives of the Partnership, and has (or has had the opportunity to) consulted with legal counsel regarding this Agreement." And Section 9.12 states, "This Agreement supersedes any prior understandings or written or oral agreements between the parties respecting the within subject matter and contains the entire understanding between the parties with respect thereto." [41]

Dr. Cravens attempted at one point during trial to show that, contrary to the clear and unambiguous language contained in sections 3.01.2(x) and 1.02.3, section 1.01.32 of the Partnership Agreement provides that developer fees would not be paid until a construction loan was obtained. He raises the same argument on appeal. Section 1.01.32 defines the term "Project" as "[t]he acquisition of the Property, and the development, construction and delivery to tenants of a fully operational ..., licensed and approved surgical/hospital facility ... *through the obtaining of a Construction Loan.*" [Emphasis added.] The phrase "through the obtaining of a Construction Loan" identifies *the means* by which the "Project" would be funded and accomplished, not *the date* at which the "Project" would begin. Dr. Cravens's interpretation cannot be sustained in light of our well-established rules of contract construction. *See Coker v. Coker,* 650 S.W.2d 391, 393–94 (Tex.1983).

The supreme court has cautioned us to look for "red flags" indicating that justifiable reliance is unwarranted. *See Grant Thornton LLP,* 314 S.W.3d at 923. There are red flags in this case, and they could not be larger and more weathered. By all accounts, the executed Partnership Agreement was the result of an arm's length transaction. Also, the Partnership Agreement specifically allowed for the payment of developer fees, and several other provisions effectively established that Dr. Cravens knew so. Given Dr. Cravens's individual characteristics, abilities, and appreciation of the facts and circumstances at or before the time of the alleged misrepresentation, we hold that the evidence is legally insufficient to show that Dr. Cravens justifiably relied upon any representation that developer fees would not be paid until after a construction loan was secured. *See Atlas Props., Inc. v. Republic Waste Servs. of Tex., Ltd.,* No. 02–11–00332–CV, 2012 WL 579442, at *2–3 (Tex.App.–Fort Worth Feb. 23, 2012, no pet.) (mem.op.) (holding that party could not justifiably rely upon oral representations that were directly contradicted by terms of written agreement); *cf. Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.,* 356 S.W.3d 54, 75–76 (Tex.App.–Houston [1st Dist.] 2011, no pet.) (holding that contractor could not show that it reasonably relied upon alleged misrepresentation). Ac-

---

41. The parties do not dispute that this is a merger clause, but the RCC and RCP Appellants do not argue that it was sufficient, in and of itself, to disclaim reliance on any alleged misrepresentations. Indeed, the supreme court has clarified that unlike a clear and unequivocal disclaimer of reliance on representations, a pure merger clause does not, standing alone, conclusively disprove re-

liance. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.,* 341 S.W.3d 323, 334–36 (Tex.2011). The RCC and RCP Appellants merely argue that the merger clause is but one piece of evidence that supports their argument that Dr. Cravens could not have justifiably relied upon the alleged oral representations regarding the developer fees.

cordingly, insofar as any of the jury's findings in question number 6 are premised upon that alleged representation, the evidence is legally insufficient to support the finding.

### 4. Jury Question Number 6 Conclusion

The evidence is legally and factually sufficient to support the jury's findings that Lake and RCC committed statutory fraud against Dr. Cravens before February 15, 2008, but legally insufficient to support the jury's findings that Rian and RCP committed statutory fraud against Dr. Cravens before February 15, 2008. We therefore sustain in part and overrule in part the RCC Appellants' third issue and sustain this part of the RCP Appellants' second issue.

### C. Jury Question Number 7

██ Jury question number 7 was predicated on at least one affirmative finding in question number 6 and stated as follows:

Did Myers commit statutory fraud against Dr. Cravens?

For purposes of this Question, you are instructed that "fraud" occurs when—

a. a person has *actual awareness* of the falsity of a *representation* or promise made by another person, and

b. fails to disclose the falsity of the representation or promise to the person defrauded, and

c. benefits from the false representation or promise.

Actual awareness may be inferred where objective manifestations indicate a person acted with actual awareness.

"Representation or promise" means the representation or promise you found to be fraud in response to Question No. 6. *See* Tex. Bus. & Com.Code Ann. § 27.01(d). The RCP Appellants argue that there is no evidence that Myers had actual awareness of any alleged misrepresentation made by one of the individuals or entities listed in jury question number 6. Because question number 7 instructed the jury that "Representation or promise" means the representation or promise that the jury found in question number 6, and because we have determined that the evidence supports the jury's finding that Lake committed statutory fraud against Dr. Cravens before February 15, 2008, by representing that he had developed a hospital in Georgia and had overseen the expansion at Baylor Grapevine, we must examine the record for evidence that Myers was actually aware that Lake made those misrepresentations to Dr. Cravens.

We agree with Dr. Cravens that the record shows that Myers was involved with the project to some extent from the beginning. Rory emailed Myers on May 7, 2007, and asked if he was available to attend a meeting with Dr. Cravens; Rory emailed Reed on May 10, 2007, and said that he had visited with Myers about the project; Myers emailed Rory on May 26, 2007, and asked about Dr. Cravens's equity contribution; and both Rory and Lake sent emails to Myers asking for his comments, respectively, about the first and second LOIs.[42] In addition to the documen-

---

42. Regarding the second LOI, Myers wrote the following in an email when asked for comments about the second LOI:

1. Given the very high cost psf of the project, a 10% rent might be too low. The sales cap rate might be higher because of that risk. I do like the rent bump, however, I might suggest CPI + 1% per year after the first 3 years.

2. I like the idea of having him invest his land. What is the agreed value of it? Also, I didn't understand your reference to a land note that needs to be paid off at the end of construction.

tary evidence, Dr. Cravens testified that he was told that Myers controlled RCC and RCP. Dr. Cravens also testified that at some point in mid-May 2009, Myers told him that he had been "involved" in the project from the beginning, that Lake and Rian reported to him daily, and that he knew everything "about the project [ ]."

While this evidence demonstrates Myers's involvement with the project to some extent, none of it is direct evidence that Myers was actually aware that Lake had misrepresented his past experience. Consistent with question number 7's instructions, we may also consider whether the jury could have inferred that Myers was actually aware that Lake had misrepresented his past experience. However, all of Myers's objective manifestations indicate that he acted with actual awareness of key project-related details—meeting with Dr. Cravens, the equity that Dr. Cravens was going to contribute, the amount of rent that CNDH would pay to the Partnership—but not of every fact or detail that Lake represented to Dr. Cravens, including his past experience. Attributing Myers with actual awareness of every work-related representation made by Lake simply because Myers was the "boss" is unrealistic, clearly punitive, and contrary to the jury charge. We hold that the evidence is legally insufficient to support the jury's answer to question number 7 that Myers committed statutory fraud against Dr. Cravens. *See Woodlands Land Dev. Co., L.P. v. Jenkins*, 48 S.W.3d 415, 426–28 (Tex.App.–Beaumont 2001, no pet.) (holding that evidence was legally

insufficient to support statutory fraud finding because appellant was not actually aware of real estate agent's misrepresentations). We sustain this part of the RCP Appellants' second issue.

### D. Jury Question Number 34

■■■■ Jury question number 34 stated in relevant part as follows:

> *Between February 15, 2008 and October 1, 2008* did any of those named below commit fraud by nondisclosure against Dr. Cravens *that induced him to sign a deed conveying the Summit Avenue property into the Partnership?* [Emphasis added.]

As they argued in their motion for JNOV, the RCC Appellants contend in their issue 2b that the jury's affirmative findings in question number 34 are legally immaterial and should be disregarded because the question is premised upon a legal theory that Texas law does not recognize—"continuing" fraud.[43] Specifically, the Partnership and Contribution Agreements legally obligated Dr. Cravens to cause Willmar to contribute the Property to the Partnership concurrently with the closing of the interim loan. The legal obligation to contribute the Property came into existence on February 15, 2008—when the agreements were executed—and continued through October 1, 2008—when Willmar contributed the Property. Consequently, Dr. Cravens could not have been induced *again* into doing what the he was *already* legally obligated to do under the Partnership and Contribution Agreements; therefore, no fraudulent nondisclosures that occurred

---

**43.** A trial court may disregard a jury verdict and render judgment notwithstanding the verdict (JNOV) if a directed verdict would have been proper. *See* Tex.R. Civ. P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex.2003); *Fort Bend Cty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex.1991). A directed verdict is proper when the evidence conclusively

establishes the right of the movant to judgment or negates the right of the opponent. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex.2000); *Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 454 (Tex.App.–Fort Worth 2009, pet. denied) (op. on reh'g).

during that timeframe could alter his preexisting obligation. In other words, the RCC Appellants argue that Dr. Cravens could not have been induced to do something that he was already legally obligated—and had already been induced—to do.

Directing us to several state and federal cases, Dr. Cravens responds that Texas law does indeed permit a party to recover damages for post-contract fraud. *See Kajima Int'l, Inc. v. Formosa Plastics Corp., USA,* 15 S.W.3d 289 (Tex.App.–Corpus Christi 2000, pet. denied); *see also Regus Mgmt. Grp., LLC v. Int'l Bus. Mach. Corp.,* No. 3:07–CV–1799–B, 2008 WL 1836360 (N.D.Tex.2008); *Eastman Chem. Co. v. Niro, Inc.,* 80 F.Supp.2d 712 (S.D.Tex.2000).

In *Kajima,* Formosa awarded Kajima several contracts to perform work on its expansion plant project. 15 S.W.3d at 291. The contracts "permitted Kajima to work overtime only if Kajima or its subcontractors delayed the work, and provided no additional compensation for such work." *Id.* Delays followed, and Kajima sued Formosa, alleging and presenting evidence at trial that Formosa had "engaged in a 'string along' fraud scheme in which Formosa made repeated false promises to compensate Kajima for delays, disruptions, bid omissions, and additional costs in order to keep Kajima working." *Id.* The trial court permitted jury questions inquiring whether Kajima had *entered into* the contracts as a result of fraud by Formosa but prohibited questions inquiring about Formosa's alleged acts of fraud to "string along" Kajima *after* the work was underway. *Id.* Formosa argued on appeal that "the only type of fraud claim which can exist in a contract setting is a claim for fraud in the inducement of contracts," but the court of appeals disagreed, pointing out that "[t]he promise in the instant case *was not a promise to pay what was owed under the contract*. Rather, the promise to pay for overtime work *was outside the purview of the contract*." *Id.* at 292–93 (emphasis added). Observing that it could "find no opinion precluding recovery for fraud because the fraud occurred after execution of a contract," the court of appeals held that the trial court had abused its discretion by excluding the questions about post-contract fraud. *Id.* at 293.

██ We have no qualms about *Kajima,* and we agree that Texas law permits a party to recover damages for post-contract fraud under certain circumstances, but *Kajima* is inapposite. It simply holds that a party is entitled to a jury question inquiring about post-contract fraud when that alleged fraud is not derived from a preexisting obligation covered by contract. Here, jury question number 34 asked about fraudulent nondisclosures occurring between February 15, 2008 and October 1, 2008, but then paradoxically tied those alleged nondisclosures to any that induced Dr. Cravens to sign a deed conveying the Property—something that he was already contractually obligated to do. *Kajima* does not speak to these facts.

Relatedly, both federal cases cited by Dr. Cravens turned on an application of the independent injury rule, which precludes a tort claim if "1) the claim is for breach of duty created *solely* by contract rather than a duty imposed by law, and 2) the injury is only the economic loss to the subject of the contract itself." *Eastman Chem. Co.,* 80 F.Supp.2d at 717 (emphasis in original); *see Regus Mgmt. Grp.,* 2008 WL 1836360, at *6–7. We agree with Dr. Cravens that the independent injury rule would not necessarily bar recovery under question number 34, but that in itself does not somehow liberate the question from all potential error. The question did not ask if Lake, Rian, GenPar, and RCC commit-

ted fraud by nondisclosure against Dr. Cravens between February 15, 2008 and October 1, 2008. It asked if Lake, Rian, GenPar, and RCC committed fraud by nondisclosure against Dr. Cravens between February 15, 2008 and October 1, 2008, *that induced him to sign a deed conveying the Property into the Partnership*. Neither question implicates the independent injury rule, but the addition of the italicized language in the latter fundamentally alters the nature of the inquiry and, therefore, its review for charge error.

We agree with the RCC Appellants that jury question number 34 contained reversible charge error and should have been disregarded. *See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex.2009) (reasoning that a judgment will not be reversed for charge error unless the error was harmful because it probably caused the rendition of an improper verdict); *see also Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 223 (Tex. 2010) (stating that charge error is generally considered harmful if it relates to a contested, critical issue). The Partnership and Contribution Agreements legally obligated Dr. Cravens to cause Willmar to contribute the Property to the Partnership concurrently with the closing of the interim loan. The Contribution Agreement even spelled out *how* the contribution would be effected—it required a special warranty deed, "fully executed" and "conveying to [Partnership] title to the" Property. As a matter of law, Dr. Cravens's act of signing the deed on October 1, 2008, was the performance of the promise that

he had made on February 15, 2008. It could not have instead been the result of fraudulent nondisclosures occurring after that contractual obligation arose. We sustain the RCC Appellants' issue 2b.

## VI. ACTUAL DAMAGES—FRAUD

We have determined that the evidence is legally and factually sufficient to support the jury's fraud findings in question number 6 as to Lake and RCC, so we must now address the RCC Appellants' arguments challenging the jury's damages awards resulting from that fraud.[44] The RCC Appellants argue in their fourth and fifth issues that the evidence is legally and factually insufficient to support the jury's damages awards in question number 8 because Dr. Ruhter's testimony was unreliably speculative and because Dr. Cravens's limited testimony on damages was fatally conclusory. Dr. Cravens argues just the opposite.

Texas recognizes two measures of direct damages for fraud: the out-of-pocket measure and the benefit-of-the-bargain measure. *Formosa Plastics Corp. USA*, 960 S.W.2d at 49. Dr. Cravens observes that the RCC Appellants' "discussion of 'out-of-pocket' damages is irrelevant, since [he] elected to recover on the 'benefit of the bargain' damages awarded by the jury."[45] "Benefit-of-the-bargain damages derive from an expectancy theory and evaluate the difference between the value of what was represented and the value actually received." *Drury Sw., Inc. v. Louie Ledeaux #1, Inc.*, No. 04–12–00837–CV, —— S.W.3d ——, ——, 2013

---

44. We need not address the RCP Appellants' arguments on this matter because we sustained their challenges to the underlying liability findings. *See* Tex.R.App. P. 47.1.

45. Those damages were (i) $2,820,000 for "[t]he difference, if any, between the value of what Dr. Cravens agreed to and the value of

what he received as of February 15, 2008," and (ii) $738,000 for "[l]ost profits, if any, sustained in the past that derive from Dr. Cravens' interest in the Partnership." The jury also awarded Dr. Cravens $300,000 under "Element F" of question number 8, but he did not elect to recover those damages.

WL 5812989, at *11 (Tex.App.–San Antonio Oct. 30, 2013, no pet.). Lost profits are recoverable under the benefit-of-the-bargain measure. *Formosa Plastics Corp. USA*, 960 S.W.2d at 50. "Thus, damages based on lost profits ... are benefit-of-the-bargain damages...."[46] *Drury Sw., Inc.,* —— S.W.3d at ——, 2013 WL 5812989, at *11.

The law is well settled that lost profits must be proved with reasonable certainty. *Phillips v. Carlton Energy Grp., LLC,* 475 S.W.3d 265, 278 (Tex.2015). Particularly significant here, "courts draw a distinction between uncertainty ... as to the *amount* and uncertainty as to the *fact* of legal damages." Sw. *Battery Corp. v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1099 (1938) (emphasis added). "[U]ncertainty as to the fact of legal damages is fatal to recovery, but uncertainty as to the amount will not defeat recovery." *Id.*

"What constitutes reasonably certain evidence of lost profits is a fact intensive determination." *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992). While the reasonable certainty requirement "is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise," we cannot forget that it "serves to align the law with *reality* by limiting a recovery of damages to what the claimant might have expected to realize *in the real world* had his rights not been violated." *Phillips,* 475 S.W.3d at 278, 280 (emphasis added); *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279 (Tex.1994). Thus, profits that are "largely speculative, as from an activity dependent on uncertain or changing market conditions" cannot be recovered. *Tex. Instruments, Inc.,* 877 S.W.2d at 279. Indeed, "[t]he law is wisely skeptical of claims of lost profits from ... unpredictable circumstances, which in reality are little more than wishful thinking." *Phillips,* 475 S.W.3d at 280. The "common thread running through [our lost-profits caselaw] is the necessity that the claim of lost profits not be hypothetical or hopeful but substantial in the circumstances." *Id.* at 279.

## A. Dr. Ruhter

Dr. Ruhter testified about the profits that Dr. Cravens would have realized (i) from his interest in the Partnership before he purchased the completed hospital and (ii) if the hospital been built and he had exercised his option to purchase it. Dr. Ruhter also opined about CNDH's profits had the hospital been built and operated for twenty years. Dr. Cravens argues that the evidence of lost profits was reasonably certain because CND, PA had an established, successful neurosurgical practice, its members were experienced, and the market for neurosurgery was stable or projected to grow. Thus, according to Dr. Cravens, "the experience of the persons involved in the enterprise, the nature of the business activity, and the relevant market all favor the success and profitability of the new enterprise."

We agree with part of Dr. Cravens's argument. Had the project been completed and had Dr. Cravens been able to purchase the hospital, CNDH probably would have collected hospital fees and CND, PA probably would have maintained a successful neurosurgical practice. But there is a glaring problem with this rosy prediction: for it to have become a reality, numerous significant events *had* to have occurred,

---

**46.** The RCC Appellants collectively refer to the jury awards in question number 8 that Dr. Cravens elected to recover as "lost-profit" damages. Whether that is technically correct or not, it is clear that they challenge both awards on the grounds addressed in this analysis.

notwithstanding Lake's misrepresentation about his experience, and based on everything that we have reviewed in the entire record, the odds of those events happening were downright abysmal, leading us to the inescapable conclusion that Dr. Ruhter's opinion testimony on lost profits was entirely speculative.

Specifically, and first and foremost, the parties would have to have secured debt financing in the amount of approximately $30 million both (1) at a rate that was acceptable to Dr. Cravens (because diluting his equity position was unacceptable) and (2) during a period in time at which doing so was incredibly difficult. As the record repeatedly makes clear, the reality of the situation was that in 2008 and 2009, when the parties were seeking financing for the project, the economy was in poor condition, the markets were uncertain, and banks were lending commercially at debt-to-equity ratios between 60/40 and 65/35.[47] In June 2009, Myers notified Dr. Cravens that they were willing to delay the project if they were unable to achieve an acceptable financing structure, but Dr. Cravens insisted that the project continue and that they obtain financing in accordance with the terms of the Partnership Agreement. Ultimately, *one bank* (IronStone) issued a term sheet with rates that were close to what Dr. Cravens needed, but he refused its demand for additional collateral and removed GenPar, bringing the project to a halt. The project could not even clear its first hurdle—obtaining a construction loan.

In addition to debt financing, the parties would have to have secured additional equity financing of at least several million dollars, something that was equally challenging in 2009. HFF sent the equity packets to 105 different capital sources, RCP attempted to obtain EB–5 capital,

and Rian made some initial efforts to secure a $2.5 million certificate of deposit as a pledge, but by November 2009, none of the efforts had proved successful.

In addition to debt and equity financing, the parties would have to have obtained a loan for FF & E. Conroy at PSG estimated that the loan would have been for approximately $10 million. By November 2009, no one had presented anything formal to a bank for this loan.

In addition to debt financing, equity financing, and FF & E financing, the parties would have to have obtained working-capital financing—funds to cover expenses before the hospital began producing revenue. According to Conroy, the loan would have been for approximately $5 million. No working-capital loan was secured.

Assuming that the parties could have obtained debt financing, equity financing, FF & E financing, and working-capital financing, and assuming that the hospital was successfully constructed, in order to purchase the hospital pursuant to his option, Dr. Cravens would have to have obtained debt financing. Dr. Ruhter calculated that it would cost approximately $41 million to purchase the hospital and that Dr. Cravens would receive a distribution of approximately $7 million from its sale, leaving Dr. Cravens with the burden of securing a mortgage in the amount of approximately $33 million.

In *Barton v. Resort Development Latin America, Inc.*, the Dallas court of appeals considered whether the evidence supporting a jury's multi-million dollar award for lost-profits damages was reasonably certain. 413 S.W.3d 232, 236–40 (Tex.App.–Dallas 2013, pet. denied). The lawsuit stemmed from a failed venture to develop two hotel resorts in Mexico. *Id.* at 234.

---

47. HFF—which brokers financing between borrowers and lenders—did $43 billion in business in 2007. It only did between $8 and 9 billion in 2009.

The court concluded that the evidence of lost profits was not reasonably certain in part because of (1) uncertainty surrounding the necessary underlying transactions for the development of one of the hotels and (2) changing economic conditions. *Id.* at 236–40. Regarding the former reason, the court stated, "To conclude JMJ Development Mexico would ever have developed a W Hotel resort on the Shabshab property, we would be required to stack assumption upon assumption, which we will not do." *Id.* at 238. Regarding the latter reason, the court explained,

> The successful development of the W Hotel project was dependent on, among other things, the economic climate remaining favorable to such a development, as the market apparently was when JMJ Development Mexico first began working on the development in 2006. However, the undisputed evidence in the record shows the economic climate changed; the recession caused "pretty much everything" to stop and the W Hotel project "in all likelihood" would have been mothballed for three to five years. Because of the uncertain and changing market conditions in which the appellees proposed to develop the W Hotel project, the lost profits they seek to recover were speculative and not reasonabl[y] certain.

*Id.* at 239–40.

 Rule of evidence 702 requires the proponent of expert testimony to show not only that the expert is qualified but also that the expert's testimony is relevant to the issues in the case and based on a reliable foundation. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995). Speculative expert testi-

mony is unreliable. *TXI Transp. Co. v. Hughes,* 306 S.W.3d 230, 239 (Tex.2010).

Dr. Ruhter opined about Dr. Cravens's lost profits, but in doing so, he assumed that Dr. Cravens and his business associates would secure millions and millions of dollars in financing at a time when the economy was struggling and uncertain and Dr. Cravens was inclined to push forward while demanding financing terms that were inconsistent with going rates, thus minimizing the number of, but increasing the collateral requirements expected by, potential lenders. Acknowledging this unforgiving reality can lead to only one conclusion: lost profits were not reasonably certain. *See Phillips,* 475 S.W.3d at 278–80 (holding that evidence of lost profits for purposes of determining fair market value of interest in coalbed methane exploration prospect in Bulgaria was speculative); *Barton,* 413 S.W.3d at 236–40; *see also Sw. Battery Corp.,* 115 S.W.2d at 1099.[48]

We hold that Dr. Ruhter's testimony was unreliably speculative and, therefore, no evidence of reasonably certain lost profits. The evidence is legally insufficient to support the jury's damages awards in question number 8 insofar as any part of the awards was based on Dr. Ruhter's testimony.

### B. Dr. Cravens

 Dr. Cravens alternatively argues that his testimony was some evidence to support the jury's damages awards in question number 8. Again, we have to disagree. Dr. Cravens testified,

> Q. Doctor, how much money are you asking that the defendants pay to you in connection with this lawsuit?

---

48. The cases that Dr. Cravens directs us to are inapposite. *See Aboud v. Schlichtemeier,* 6 S.W.3d 742 (Tex.App.–Corpus Christi 1999, pet. denied); *Ishin Speed Sport, Inc. v. Rutherford,* 933 S.W.2d 343 (Tex.App.–Fort Worth 1996, no writ).

A. The total amount, I don't know what that amount is. I would have to look at that.

Q. The approximate amount?

A. I believe I stated earlier that from the standpoint of what I feel I have lost in this case has to do with the asset I contributed to the partnership, the property, the rent that I had paid, my practice has paid for the last 18 months. I have over a million dollars in attorneys' fees, and the hospital that was to be built, the operating entity, not the real estate, that operating entity can't happen now.

Q. How much money are you asking that the defendants be required to pay to you in this lawsuit?

A. I would ... say somebody who does that sort of financial calculation, I don't know what that is.

Q. Five million, 10 million, 15 million, 20 million?

A. For the different parts, I don't know what that amount is. I would ... say a financial expert who does that sort of calculation to make that recommendation, otherwise, as you would say, that would be me speculating.

At another point, Dr. Cravens testified,

Q. ... So far you failed to tell me or your own counsel a number, but I want to ask you how much money are you asking for in this case?

A. And my answer is that I would ask for financial experts who do this sort of calculation, based on what I have described, I feel.

Q. They are financial experts that you have hired; is that correct?

A. As experts, yes.

Q. They are financial experts that you have paid; is that correct?

A. As experts, yes.

Q. They are financial experts that you have asked reports from; is that correct?

A. Correct.

Q. They are financial experts that have provided reports to you; right?

A. Yes.

Q. And you have reviewed those reports; right?

A. In general, yes.

Q. How much money are you asking to be paid in this case based upon the work of your financial experts?

A. I honestly do not know that amount. I—

Q. Is it $5 million?

A. I do not know, sir.

Q. Is it $10 million?

A. For the—everything? I don't know what the final amount would be.

Q. Is it less than $50 million?

A. Yes.

Q. Is it less than $25 million?

A. I think so, yes.

Q. Is it less than $20 million?

A. I don't know.

And finally, at another point during his examination, Dr. Cravens testified,

Q. Dr. Cravens, counsel asked how much money you wanted, okay, and if I remember correctly, you said you didn't know how to calculate it, somebody else would have to do that for you, but then he asked you about how much, and he left with a, "Is it under 25 million," and I think you finally agreed with him. Do you recall that?

A. Yes, sir.

Q. Okay. Now, under 25 million could be a dollar. Is it a dollar, Dr. Cravens, or is it some other number?

A. No, sir, it's not a dollar.

Q. Okay. Don't care how difficult it is for you, Dr. Cravens, tell us how much money do you think you're entitled to for them not building that hospital, not having the benefit of that hospital, not having the benefit of being able to buy it back, the benefit of the bargain, Dr. Cravens.

A. I know it's a lot of money and I don't know what the exact number is. Financial people say it's somewhere between 20 and 25 million. I don't know specifically what the number is. For me—

. . . .

Q. Dr. Cravens, in ... looking at the future of what would have been if the hospital would have been built and the lease of 20 years would have flown out as agreed upon or that you had been able to purchase the lease, purchase the real property and go get a bank loan for however many millions of dollars, do you know how to calculate what that would be in dollars today?

A. No, sir, I do not.

Q. Okay. Did you—counsel asked you, did you retain experts to do that?

A. Yes, sir, I did.

Q. Okay. And you've had a chance to look at their reports?

A. Yes, I have.

Q. Okay. And the best you can recall, their reports come back to this— what number did you say again?

A. 20 to $25 million.

Thus, regarding his alleged damages, Dr. Cravens either (1) relied upon Dr. Ruhter's opinions or (2) said that he did not know. Insofar as Dr. Cravens was capable of relying upon Dr. Ruhter's opinions for damages, Dr. Cravens's testimony was no evidence because Dr. Ruhter's testimony was no evidence. *See Gharda USA, Inc. v. Control Sols., Inc.,* 464 S.W.3d 338, 352 (Tex.2015) (holding that testimony of two experts was unreliable because they relied on the testimony of two other experts, which was also unreliable). Insofar as Dr. Cravens confirmed that he did not know about his damages, his testimony is no evidence of damages. *See Tate v. Goins, Underkofler, Crawford & Langdon,* 24 S.W.3d 627, 635 (Tex.App.–Dallas 2000, pet. denied) ("Damages must be ascertainable in some manner other than by mere speculation or conjecture, and by reference to some fairly definite standard, established experience, or direct inference from known facts."). Further, even if we disregarded Dr. Cravens's reliance upon Dr. Ruhter's opinions and his "I don't know" statements, his testimony would still be no evidence because it was entirely conclusory.[49] *See Nat. Gas Pipeline Co. of Am. v. Justiss,* 397 S.W.3d 150, 156–57 (Tex.2012) (confirming that conclusory or speculative testimony will not support a judgment); *Holt Atherton Indus., Inc.,* 835 S.W.2d at 84 (holding that testimony of owner that he lost approximately $200,000 in income was legally insufficient because it did not provide any indication of how the damages were determined).

**49.** The jury's $2.82 million damages finding in "Element A" of question number 8 is not supported by the value of the Property. The question asked about "[t]he difference, if any, between the value of what Dr. Cravens agreed to and the value of what he received as of February 15, 2008." As explained, in exchange for Willmar's contribution of the Property, which had a fair market value of $4.8 million, Dr. Cravens received a capital contribution credit in the amount of $3.32 million and a corresponding 99.8% limited partnership interest in the Partnership. The $1.6 million difference between the fair market value of the Property and the capital credit reflects the preexisting debt on the Property that was paid off using funds from the interim loan.

We hold that Dr. Cravens's testimony was no evidence of damages for purposes of supporting the jury's findings in question number 8. Given all of the above, the evidence is legally insufficient to support the jury's damages awards in question number 8. We sustain the RCC Appellants' fourth and fifth issues.

## VII. PROMISSORY ESTOPPEL AND UNJUST ENRICHMENT

■ Jury question number 38 asked, "Did Dr. Cravens substantially rely to his detriment on the promise, if any, of RCC to develop and build the hospital and related structures, and was Dr. Cravens's reliance foreseeable by RCC?" The jury answered "Yes." Jury question number 40 asked, "Were any of those named below unjustly enriched by receiving fees and compensation from the Partnership?" The jury answered "Yes" for both Lake and RCC. The RCC Appellants argue in their sixth and seventh issues that the trial court erred by denying their motion for JNOV and by awarding judgment to Dr. Cravens on the promissory estoppel and unjust enrichment findings because neither theory is applicable when the matter is covered by an express contract. We agree.

■ Promissory estoppel and unjust enrichment are equitable remedies that are unavailable when an express contract covers the subject matter of the dispute. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 683–84 (Tex.2000); *Blackstone Med., Inc. v. Phoenix Surgicals, L.L.C.*, 470 S.W.3d 636, 654–55 (Tex.App.–Dallas 2015, no pet.). This is because parties should be bound by their express agreements, and when a valid agreement already addresses the matter, recovery under an equitable theory is generally inconsistent with the express terms of the agreement. *City of The Colony v. N. Tex.* *Mun. Water Dist.*, 272 S.W.3d 699, 731 (Tex.App.–Fort Worth 2008, pet. dism'd).

### A. Promissory Estoppel

Jury question number 38 inquired about RCC's promise to develop and build the hospital, but that topic is expressly covered by the Partnership Agreement. Dr. Cravens argues that sufficient evidence supports the jury's finding because CNDH paid $1.5 million in rent to the Partnership and because Willmar contributed the $4.8 million Property to the Partnership, but the rent matter is expressly covered by the Lease Agreement between CNDH and the Partnership, and the Property contribution is expressly covered by both the Contribution Agreement and the Partnership Agreement. Dr. Cravens obtained a favorable jury finding on his breach-of-contract claim but elected not to recover under that theory. As explained below, we are remanding this cause to the trial court to allow him to make another election of remedies.

■ Dr. Cravens points out that his attorneys were paid more than $1 million, and he argues that the fees support the award of reliance damages, but the evidence shows that the fees were paid from CND, PA's line of credit and not by Dr. Cravens individually. But even if Dr. Cravens had personally paid some or all of the attorneys' fees, his attorneys' fees for prosecution of the lawsuit are not expenditures made in reliance on RCC's promise to develop and build the hospital. They are expenditures made for purposes of recovering damages in this lawsuit, and as such, they are not compensatory, out-of-pocket damages. *See In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d 168, 171–175 (Tex.2013) (holding attorney's fees incurred in prosecuting or defending litigation are not compensatory damages and thus need not be superseded pending ap-

peal under civil practice and remedies code section 52.006); *Alma Grp., L.L.C. v. Palmer*, 143 S.W.3d 840, 846 (Tex.App.– Corpus Christi 2004, pet. denied) (holding party not entitled to recover attorney's fees without also recovering damages for breach of contract in part because "attorney fees are in the nature of costs, not damages"). Thus, Dr. Cravens points to no evidence in the record of expenditures he personally made in reliance upon RCC's promise to develop and build the hospital and related structures.[50]

### B. Unjust Enrichment

Jury question number 40 inquired about fees and compensation from the Partnership, but this matter is covered by the Partnership Agreement, as we thoroughly explained above. Dr. Cravens alternatively sought to recover damages for misrepresentations involving the payment of developer fees, and we also addressed that issue above.

The Partnership argues that the Partnership Agreement was nullified by fraudulent inducement, but as the RCC Appellants point out, Dr. Cravens did not elect to rescind the Partnership as a remedy for fraud.[51]

The Partnership alternatively argues that the unjust enrichment recovery should stand because the developer fees constituted overpayments on the contract, but the Partnership's argument exceeds the scope of what the jury was asked to find. The jury was asked to find the amount that RCC and Lake were unjustly

enriched by "receiving fees and compensation from the Partnership" as a result of "fraud, duress[,] or the taking of undue advantage." The jury was not asked to determine the amounts of any overpayments under the Partnership Agreement. Thus, although we recognize the exception permitting recovery of overpayments under a contract on an unjust enrichment theory, *see Fortune Prod. Co.*, 52 S.W.3d at 684 (noting exception to unjust enrichment express-contract defense for overpayments on contract); *Sw. Elec. Power Co. v. Burlington Northern Railroad Co.*, 966 S.W.2d 467, 469–70 (Tex.1998) ("[I]n some circumstances, overpayments under a valid contract may give rise to a claim for restitution or unjust enrichment."), the exception cannot apply here in the absence of a question asking the jury to determine the amount of overpayments, if any, under the Partnership Agreement.[52]

Dr. Cravens argues that the trial court correctly awarded final judgment on the promissory estoppel and unjust enrichment findings because neither Lake nor RCC were parties to the Partnership Agreement, but recovery under either theory is prohibited when the *subject matter* of a contract covers the dispute. *See Fortune Prod. Co.*, 52 S.W.3d at 684.

We hold that the trial court erred by denying the RCC Appellants' motion for JNOV as to the jury's findings in question numbers 38 and 40 because promissory estoppel and unjust enrichment are legally unavailable under these circumstances.

---

**50.** To the contrary, the undisputed evidence is that Dr. Cravens personally received almost $500,000 from the proceeds of the interim loan as reimbursement for his past expenditures.

**51.** Indeed, Dr. Cravens and the Partnership elected to have the trial court enter judgment on their declaratory judgment claim that Gen-Par "was properly removed as the General

Partner of [the Partnership] pursuant to the terms of the [Partnership] Agreement."

**52.** There was no contention at trial that the developer fees were "overpayments" for anything; Dr. Cravens's theory and argument has always been that the fees were not permitted until a construction loan was obtained.

We sustain the RCC Appellants' sixth and seventh issues.

## VIII. INDEMNITY FOR RIAN

In their ninth issue, the RCC Appellants argue that the trial court erred by denying Rian's motion for judgment relating to his claim for contractual indemnity.

The indemnity provision of the Partnership Agreement states in relevant part as follows:

> Neither the General Partner, nor any member, manager, shareholder, director or officer thereof shall, however, be liable, responsible or accountable in damages or otherwise to any Partner for any acts performed by it or him in good faith and within the scope of this Agreement or any failure to act unless such act or failure to act is the result of gross negligence or fraud. To the fullest extent allowed by the [Texas Business Organizations Code] and other applicable law, the Partnership shall indemnify, defend against and save harmless the General Partner and its officers ... (each an *"Indemnified Person"*) from any expenses (including reasonable attorney's fees and court costs)[,] liabilities, claims, causes of action, losses or damages incurred by reason of any act or omission performed or omitted by any Indemnified Person in good faith on behalf of the Partnership or any other Partner and in a manner reasonably believed by the Indemnified Person to be within the scope of the authority granted to it by this Agreement ....

Question 44 of the jury charge asked the jury as follows:

> Beginning on February 15, 2008, do you find that those named below acted in good faith on behalf of the Partnership or any other partner and in a manner reasonably believed by them to be

within the scope of authority granted to them by the Partnership Agreement?

The jury found that Rian acted in good faith but that Lake and GenPar did not.

■ Based on the indemnification provision in the Partnership Agreement and the jury's answer to question number 44, the RCC Appellants contend that the trial court erred by denying Rian's motion for judgment on his indemnity claim. The Partnership responds that Rian's claim for indemnity is barred by the jury's fraud findings against Rian in question numbers 1 and 6 and that the business organizations code does not permit indemnification if the one seeking it has been found liable to the enterprise for "wilful or intentional misconduct in the performance of the person's duty to the enterprise." *See* Tex. Bus. Orgs.Code Ann. § 8.102(b)(3)(A) (West 2012). The Partnership also argues that there is no evidence that Rian actually incurred attorneys' fees in this case.

Arguing that the fraud findings against Rian prohibit indemnification, the Partnership points to the first sentence quoted above and contends that the Partnership Agreement prohibits indemnification for acts of fraud and gross negligence. However, that sentence does not address indemnification. By its plain language, the sentence relates to liability "to any Partner" and provides that liability to a partner could result from gross negligence or fraud. The sentence does not apply to the Partnership's indemnification of an officer.

The Partnership further argues that the trial court properly denied Rian's claim for indemnity because Rian was found liable for wilful or intentional misconduct. *See id.* Section 8.102(b)(3)(A) provides in relevant part that

> (b) Indemnification under this subchapter of a person who is found *liable to the enterprise* or is found liable be-

cause the person improperly received a personal benefit:

. . . .

 (3) may not be made in relation to a proceeding in which the person has been found liable for:

 (A) wilful or intentional misconduct in the performance of the person's duty to the enterprise.

*Id.* (emphasis added). This section also does not preclude Rian's claim for indemnity because he has not been "found liable to the enterprise." *Id.* Indeed, the jury was not asked whether Rian should have any liability to the Partnership. Rather, all of the jury questions asking about Rian's conduct related to alleged liability to Dr. Cravens, not to the Partnership. And in response to the only question asked of the jury about Rian's conduct toward the Partnership, the jury found that he acted in good faith. Therefore, Rian has not been found liable to the Partnership, and section 8.102(b)(3)(A) does not preclude his claim for indemnity. *See id.*

 The Partnership next argues that there is no evidence that Rian actually incurred attorneys' fees in the case. The Partnership presumably relies on business organizations code section 8.102(a)(2), which provides in pertinent part that an enterprise may indemnify a governing person or delegate against expenses "that are reasonable and *actually incurred* by the person in connection with a proceeding." *Id.* § 8.102(a)(2) (emphasis added). The business organizations code does not define "actually incur" or "incur," nor do any of the parties point us to any caselaw definitions that would guide our analysis. We have not located any cases analyzing "actually incurred" as used in section 8.102(a)(2), but we note that the supreme court has addressed a provision in chapter 74 of the civil practice and remedies code that contains similar language. *See Gar-*

*cia v. Gomez,* 319 S.W.3d 638, 642–43 (Tex. 2010) (holding some evidence existed that physician incurred fees because services had been performed on the physician's behalf); *Aviles v. Aguirre,* 292 S.W.3d 648, 649 (Tex.2009) (holding physician entitled to recover attorney's fees actually paid by malpractice insurer because physician was "personally liable in the first instance").

 Section 74.351(b)(1) of the civil practice and remedies code provides for an award of "reasonable attorney's fees and costs of court *incurred by the physician*" if the plaintiff does not timely serve an adequate expert report. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b)(1) (West Supp.2014) (emphasis added). In *Garcia,* the plaintiff did not serve the required expert report, and the trial court dismissed the case pursuant to the requirements of civil practice and remedies code section 74.351(b) but did not award attorneys' fees. 319 S.W.3d at 640; *see* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b). The court of appeals affirmed the trial court's denial of attorneys' fees and held that there was "no evidence of the reasonable fees incurred by the physician in defense of the claim." *Garcia,* 319 S.W.3d at 640.

 The supreme court reversed, holding that although the evidence was not conclusive, the testimony by the physician's attorney was some evidence that the attorneys' fees were reasonable and that the physician had incurred attorneys' fees. *Id.* at 642–43. The supreme court noted that services had been performed in the lawsuit on the physician's behalf and that "[w]hile there is no evidence about what Dr. Garcia (or perhaps his insurance carrier) agreed to pay for these services, it blinks reality to assume that the attorney was a volunteer or that Dr. Garcia did not incur attorney's fees for this work." *Id.* at 642.

 One year earlier, the supreme court reached a similar result when it held that a

physician had incurred attorneys' fees even though his malpractice insurer had actually paid the attorneys' fees on his behalf, stating that the physician was "personally liable in the first instance for both defense costs and any potential judgment" and that his procurement of insurance did not mean that the physician had not incurred attorneys' fees. *See Aviles*, 292 S.W.3d at 649.

Here, one of the RCC Appellants' attorneys testified that his law firm represented RCC, GenPar, Rian, and Lake in the litigation. The attorney generally described for the jury the services that he and the other attorneys had performed on the RCC Appellants' behalf as well as the law firm's practice of tracking hours on a monthly basis and mailing invoices to the clients for payment. The attorney acknowledged that he did not know who among his firm's clients reviewed the law firm's bills and authorized payment, but even if another of the RCC Appellants paid or advanced money for Rian's attorneys' fees, Rian was still "personally liable in the first instance" for the attorneys' fees. *See Aviles*, 292 S.W.3d at 649. The attorney's testimony thus constitutes some evidence that Rian actually incurred attorney's fees in this litigation. *See Garcia*, 319 S.W.3d at 642–43; *Aviles*, 292 S.W.3d at 649.

Returning, then, to whether the trial court erred by denying Rian's motion for judgment on his claim for indemnification, the Partnership Agreement provides for indemnification of an officer like Rian if the officer acted in good faith on behalf of the Partnership, and the jury found in response to question number 44 that Rian acted in good faith. The jury also found in response to question number 48 that reasonable and necessary attorneys' fees for the RCC Appellants were $492,971 through trial and a total of another

$200,000 for appeals to the court of appeals and the supreme court. The trial court therefore erred by denying Rian's motion for judgment on his claim for contractual indemnity from the Partnership.

We cannot, however, render judgment for Rian because the amount of attorneys' fees found by the jury includes more than those incurred by Rian in his defense. Rather, the jury's answer to question number 48 includes attorneys' fees for the defense of Lake and GenPar and attorneys' fees for prosecuting the RCC Appellants' counterclaim for a judicial declaration that GenPar was not properly removed as general partner, a counterclaim on which the RCC Appellants did not prevail at trial and have not appealed. Moreover, the RCC Appellants' attorney did not segregate these different types of attorneys' fees during his testimony. We therefore cannot render judgment for Rian on his claim for indemnification and must instead remand the matter to the trial court for reconsideration of the amount that Rian should receive as indemnification under the Partnership Agreement. *See generally Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314–15 (Tex.2006) (remanding for further proceedings because "[u]nsegregated attorney's fees for the entire case are some evidence of what the segregated amount should be"). We sustain in part and overrule in part the RCC Appellants' ninth issue.

## IX. REMAINING ISSUES AND REMAND FOR NEW ELECTION OF REMEDIES

We overruled the RCC Appellants' challenges to jury question number 6 regarding Lake and RCC's misrepresentations but sustained their challenges to jury question number 8 regarding the damages resulting from those misrepresentations; we sustained the RCC and RCP Appel-

lants' challenges to jury question number 6 as to Rian and RCP; we sustained the RCP Appellants' challenge to jury question number 7 regarding statutory fraud as to Myers; we sustained the RCC Appellants' challenge to the jury's fraud-by-nondisclosure findings in question number 34; and we sustained the RCC Appellants' challenges to the jury's promissory estoppel and unjust enrichment findings in question numbers 38 and 40. Thus, we have reversed all parts of the judgment that awarded damages to Dr. Cravens and the Partnership. We therefore need not address Appellants' issues challenging Dr. Cravens's attorneys' fees award. *See* Tex. R.App. P. 47.1 (requiring appellate courts to address each issue necessary to the disposition of the appeal). We also do not address the RCP Appellants' fourth issue concerning the jury's findings as to a securities law violation because Dr. Cravens did not elect recovery on that theory of liability. *See id.*

We cannot, however, render judgment for Appellants on all claims asserted against them by Dr. Cravens and the Partnership. When a jury finds in favor of a party on more than one alternative theory of recovery, it is generally proper for an appellate court to remand for that party to make a new election of remedies in the event the appellate court renders judgment against the party on the claims for which the party initially elected to recover. *See Drury Sw., Inc. v. Louie Ledeaux # 1, Inc.,* 350 S.W.3d 287, 293 (Tex.App.–San Antonio 2011, pet. denied); *Myre v. Meletio,* 307 S.W.3d 839, 846 (Tex.App.–Dallas 2010, pet. denied); *see also Smith v. Davis,* No. 12–12–00169–CV, 2013 WL 2424266, at *6–7 (Tex.App.–Tyler Jun. 5, 2013, no pet.) (mem. op. on reh'g).

The jury found in response to question numbers 11 through 15 that Lake and RCC committed a securities law violation,

and the jury found in response to question numbers 25 through 27 that GenPar failed to comply with the Partnership Agreement and that Dr. Cravens should recover damages for that breach of contract. At this point, the circumstances surrounding the securities law and breach of contract theories are not fully briefed by the parties or developed by the appellate record, especially considering that Dr. Cravens did not elect to recover on either of those theories of liability. Any discussion of those matters in this opinion would therefore be advisory and speculative. *See Camarena v. Tex. Emp't Comm'n,* 754 S.W.2d 149, 151 (Tex.1988) ("It is fundamental that a court has no jurisdiction to render an advisory opinion on a controversy that is not yet ripe."); *Jefferson v. Holmes,* No. 02–08–00318–CV, 2009 WL 806871, at *1 (Tex. App.–Fort Worth Mar. 26, 2009, no pet.) (mem.op.) ("[A]n appellate court has no jurisdiction to render an advisory opinion on a controversy that is not yet ripe or to decide a case on speculative, hypothetical, or contingent fact situations."). We therefore remand so that Dr. Cravens may make a new election of remedies. *See Drury Sw., Inc.,* 350 S.W.3d at 293; *Myre,* 307 S.W.3d at 846; *see also Smith,* 2013 WL 2424266, at *6–7. We thus hold that remand to the trial court is necessary and appropriate.

## X. CONCLUSION

Having sustained part of the RCC Appellants' second and third issues and their fourth and fifth issues, and having sustained part of the RCP Appellants' second issue, we reverse the portions of the trial court's judgment that awarded damages for fraud to Dr. Cravens and render judgment that he take nothing on those claims. Having sustained the RCC Appellants' sixth and seventh issues, we reverse the portions of the trial court's judgment that

awarded Dr. Cravens and the Partnership damages for promissory estoppel and unjust enrichment and render judgment that they take nothing on those claims. Having sustained part of the RCC Appellants' ninth issue, we reverse the portion of the trial court's judgment that denied any recovery to Rian on his claim for contractual indemnification from the Partnership and remand the matter to the trial court for reconsideration of the amount that Rian should receive as indemnification under the Partnership Agreement. Finally, having overruled or not reached Appellants' other issues, we remand the remainder of this cause to the trial court for further proceedings consistent with this opinion.

GABRIEL, J., concurs without opinion.